

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-13-1994

# In the Matter of: Seidman and Bailey

Precedential or Non-Precedential:

Docket 92-3722 & 92-3729

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"In the Matter of: Seidman and Bailey" (1994). *1994 Decisions*. Paper 132.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/132

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 92-3722 & 92-3729
_____

IN THE MATTER OF:

LAWRENCE B. SEIDMAN AND JOHN BAILEY,
Individually, as Persons Participating
in the Conduct of the Affairs of Crestmont
Federal Savings and Loan Association,
Edison, New Jersey

JOHN BAILEY,
                    Petitioner at No. 92-3722

LAWRENCE B. SEIDMAN,
                    Petitioner at No. 92-3729
_____

On Petition for Review of a Final Order of
The Office of Thrift Supervision,
United States Department of the Treasury
(OTS Order No. 92-149)
_____

No. 92-5392
_____

LAWRENCE B. SEIDMAN,
            Appellant

v.

OFFICE OF THRIFT SUPERVISION,
DEPARTMENT OF THE TREASURY,
UNITED STATES OF AMERICA,
            Appellee
_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 92-00505)

Argued:  August 3, 1993

PRESENT:  STAPLETON, HUTCHINSON, and ROTH, <u>Circuit Judges</u>

(Filed  September 14, 1994)

_____


John J. Sarno, Esquire                (Argued)
Robinson, St. John & Wayne
Two Penn Plaza East
Newark, NJ     07105
          Attorney for John Bailey


Samuel D. Bornstein, Esquire
The Atrium
80 Route 4 East
Paramus, NJ     07652


          and


Frank J. Eisenhart, Jr., Esquire      (Argued)
Arthur W. Leibold, Jr., Esquire
Edward Jewett, Esquire
Dechert, Price & Rhoads
1500 K Street, N.W.
Washington, DC     20005
          Attorneys for Lawrence B. Seidman


Faith S. Hochberg, Deputy Chief Counsel
Office of United States Attorney
970 Broad Street
Room 502
Newark, NJ  07102


Richard E. Shapiro, Esquire
Office of Thrift Supervision
10 Exchange Place
Jersey City, NJ     07302


          and


Harris Weinstein, Chief Counsel
Carolyn B. Lieberman, Senior Deputy Chief Counsel
Thomas J. Segal, Deputy Chief Counsel
Aaron B. Kahn, Assistant Chief Counsel      (Argued)
Teresa A. Scott, Esquire
Office of the Chief Counsel
Office of Thrift Supervision
Fourth Floor
1700 G Street, N.W.
Washington, DC     20552

Attorneys for Office of Thrift Supervision,
United States Department of Treasury

---

OPINION OF THE COURT

---

HUTCHINSON, <u>Circuit Judge</u>.


In these consolidated cases, Lawrence Seidman ("Seidman") and John Bailey ("Bailey") petition for review of the order of the Director ("Director") of the Office of Thrift Supervision ("OTS") subjecting them to administrative sanctions for their part in a loan transaction Crestmont Federal Savings and Loan ("Crestmont") considered while Seidman was Chairman of Crestmont's Board of Directors ("Board") and Bailey was one of its officers. Specifically, Bailey petitions for review of that portion of the Director's order publicly directing him to cease and desist from participating in unsafe and unsound lending practices. Seidman's petition seeks review of that portion of the Director's order removing him from his office at Crestmont and banning him from further participation in the banking industry.

When the Director issued the order against Seidman and Bailey, he remanded the case to an administrative law judge ("ALJ") to determine their ability to pay civil monetary penalties because the ALJ who had heard the case failed to assess a civil penalty against Bailey and to properly document Seidman's ability to pay the $930,000 civil penalty the ALJ had recommended. The remand order raises a question of finality that we must consider before deciding whether we have jurisdiction to

review Bailey's and Seidman's petitions.  We conclude in Part II that we do have jurisdiction.[1]

In the administrative proceeding, the Director found Bailey approved a commitment for a purchase money mortgage to a real estate buyer who was buying property from a seller in which Seidman had an interest.  The Director concluded that approval of this commitment was an unsafe and unsound lending practice justifying a cease and desist order against Bailey under section 1818(b) of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C.A. §§ 1811-1833 (West 1989 & Supp. 1994), as amended by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), P.L. No. 101-73, 103 Stat. 183 (1989).

The Director concluded that Seidman's conduct required him to issue a prohibition and removal order in accord with 12 U.S.C.A. § 1818(e).  To support this ultimate administrative sanction the Director found Seidman impermissibly used his position at Crestmont for his own benefit in order to obtain a release from his personal guarantee of a loan; this loan had been made by another lending institution to a real estate partnership

---

[1]. Seidman and Bailey also attack the remand order on the merits.  Because we will grant Bailey's petition and reverse the cease and desist order against him, those proceedings can no longer continue against Bailey.  We will therefore order the Director to terminate them.  Because of our conclusion on Seidman's petition that his case be remanded for the Director to consider entry of a cease and desist order against him, we will stay the proceedings against him concerning assessment of any monetary penalties until the Director has finally decided whether to direct Seidman to cease and desist from any further attempts to hinder OTS in any investigations pertinent to its regulatory authority.

from which Seidman was in the process of withdrawing; Seidman's withdrawal from the partnership was being negotiated at the same time that Bailey made the loan commitment for a purchase from the partnership, resulting in the Director's cease and desist order against him. As additional support for his order removing Seidman from Crestmont's Board of Directors and banning him from banking for life, the Director also found that Seidman failed to renotify Crestmont's Board or Senior Loan Committee of his continuing interest in the real estate partnership he was withdrawing from while they were considering the loan OTS objected to and that Seidman later attempted to hinder the ensuing OTS investigation by covering up his part in preparing a memo in support of his request for the release. The Director concluded that each of these findings warranted Seidman's removal as Chairman of Crestmont's Board and required him to be permanently barred from banking.

We believe the Director erred in concluding Bailey's issuance of a purchase money loan commitment to a buyer from the real estate development partnership from which Seidman was in the final stages of withdrawing exposed Crestmont to the serious, abnormal risk that constitutes an unsafe or unsound practice. Therefore, we will grant Bailey's petition for review and vacate that part of the Director's order commanding Bailey to cease and desist from such practices.

We reject Seidman's preliminary argument that 12 U.S.C.A. § 1818(e) violates due process because it fails to afford him a trial before a fair and unbiased tribunal. We

conclude, however, that the Director's findings that Seidman violated 12 U.S.C.A. § 1818(e)(1) when he sought to utilize his position at Crestmont to obtain a release from his guarantee and when he failed to remind Crestmont's Board or Senior Loan Committee of his interest in the real estate partnership are not supported by substantial evidence. Though the Director properly determined that Seidman engaged in an unsafe or unsound practice when he attempted to hinder the OTS investigation, we conclude that there is no evidence to support the Director's finding that this act of Seidman resulted in his receipt of an actual benefit meeting section 1818(e)(1)(B)(iii)'s condition of an untoward or prohibited effect.[2] Accordingly, we will grant Seidman's petition for review and vacate that part of the Director's order permanently removing him from his job at Crestmont and banning him from banking. Nevertheless, because of our conclusion that Seidman did commit an unsafe or unsound practice when he unsuccessfully attempted to hinder the OTS investigation in his dealings with his former partners and their lender, we will remand the case to OTS for the Director to consider entering a cease and desist order and civil monetary penalties against Seidman as authorized by section 1818(b).

---

[2]. The Director relied exclusively on section 1818(e)(1)(B)(iii)'s receipt of benefit from a prohibited act to meet its requirements concerning effect and made no finding that Seidman's conduct met the alternate requirement of section 1818(e)(1)(B)(i) by posing a possibility of prejudice to Crestmont's depositors or the other alternate condition of section 1818(e)(1)(B)(ii) by creating a likelihood of loss to Crestmont.

Our disposition of the merits of Seidman's petition requires us to vacate the OTS preliminary suspension order for the reasons given in Part VII of this opinion. Therefore, we find it unnecessary to consider Seidman's appeal of the district court's order dismissing, for lack of jurisdiction, his action to enjoin the preliminary suspension order.

## I.  Factual and Procedural History

### A.  Seidman's Business Dealings

Lawrence Seidman is an attorney in his mid-forties who has been engaged in the practice of banking and securities law for twenty years. During the past decade he has specialized in real estate investments and begun to pursue a career in banking. In 1989, he headed a group of investors who purchased stock in Crestmont, a thrift institution in Edison, New Jersey.[3] Seidman became a director of Crestmont and, in November 1989, was named Chairman of its Board of Directors.

In 1986, before he became a Crestmont director, Seidman formed a partnership, Fulton Street Associates ("FSA"), with James Zorlas ("Zorlas") and Lawrence Rappaport ("Rappaport") to purchase and develop industrial condominiums on a piece of commercial property ("Boonton Project"). FSA's partners made substantial capital contributions to the Boonton Project and

---

[3].  At the time the parties argued and briefed these cases, Crestmont was not one of the failed thrifts that led to the "S & L bailout." We have not been advised of any change in this respect.

obtained additional financing from United Jersey Bank ("UJB"), secured in part by all the partners' personal guarantees. Seidman listed his affiliation with FSA on conflict disclosure forms he filed with Crestmont when he became a director.

In mid-1990, Seidman decided to focus his business activities on Crestmont. Recognizing that his outside business ventures could create conflicts that would prevent Crestmont from making otherwise desirable loans, Seidman advised the Board that he had begun to withdraw from his outside business ventures and started disposing of various business interests to his former partners. Rappaport agreed to acquire Seidman's interest in FSA, promising to indemnify Seidman against any continuing obligation on FSA's loan from UJB without any further consideration flowing to Seidman. On June 1, 1991, Seidman's transfer of his interest in FSA to Rappaport became the subject of a formal agreement. Seidman testified that he lost all of the $320,000 he had invested in FSA but that he thought Crestmont offered even greater potential for profit.

Months before the June 1st agreement, however, UJB started to worry about its loan to FSA. On January 21, 1991, it sent FSA a notice of default. UJB gave FSA a chance to cure the default, but FSA denied it was in default, contending any default would have been cured if an interest reserve fund had been properly credited against its debt. Though UJB then sent FSA a demand for immediate payment, negotiations between them continued.

James Risko ("Risko"), a Poole & Co. commercial loan broker, handled negotiations to resolve the dispute between FSA and UJB. Poole & Co. was the commercial loan company that had placed the FSA loan with UJB. Roger Eberhardt ("Eberhardt"), chairman of UJB's real estate management committee, and Thomas Stackhouse ("Stackhouse"), the UJB commercial lending officer assigned to the FSA loan, were key participants in the negotiations. Risko, Eberhardt and Stackhouse all testified that the participants, including Seidman, discussed end-user financing for FSA's Boonton condominiums.[4] Crestmont was mentioned as a potential source of end-user loans, but no one testified that Seidman or Crestmont promised to make any loan. On May 20, 1991, the parties agreed to restructure the UJB loan. As part of the restructuring, the FSA partners, including Seidman, signed personal guarantees covering $4.45 million. Seidman's successful efforts to be released from the guarantee figure prominently in these proceedings, but other ongoing events also play a significant role.

---

[4]. End-user financing permits a person who plans to occupy a unit in a development to buy the unit or rent it to others. The institution that has financed the project has a strong interest in facilitating end-user financing because it usually receives a substantial part of the price the end-user pays, thus reducing its exposure on the loan to the developer.

## B.  The Levine Loan

John Bailey is the Executive Vice President of Crestmont.  His responsibilities include underwriting commercial loans, managing a commercial loan portfolio, producing new lending business and supervising Crestmont's loan officers. Bailey had authority to approve loans of less than $500,000 if they did not directly involve the interests of Crestmont's directors but had no authority to approve loans in excess of $500,000 or loans in which Crestmont's officers or directors had an interest.  Loans over $500,000 went before a "Senior Loan Committee" made up of Bailey, Seidman and Crestmont's President, S. Griffin McClellan ("McClellan").  Commercial loans in which an officer or director had an interest were prohibited at Crestmont.

In December of 1990, Steven Levine ("Levine") of S & N Realty approached Bailey about end-user financing for a $466,000 office condominium in FSA's Boonton project.  Levine, who had been referred to Crestmont and Bailey by Zorlas, sought $375,000. On December 18, 1990, Bailey contacted Zorlas, Rappaport and Seidman about Levine's loan request and asked them how things stood on Seidman's partnership interest in FSA.  All three FSA partners individually represented to Bailey that Seidman was in the process of withdrawing from the partnership and that the withdrawal would be completed "shortly."  Bailey Appendix ("Bailey App.") at 319.  Bailey memorialized this conversation and placed a memo about it in a file marked "Seidman Financial Associates."  Id.  Rappaport testified he told Bailey no loan could be made to Levine until Seidman was out of the partnership.

Assured Seidman would soon be out of FSA, Bailey decided to get a head start on the Levine loan and assigned James Little ("Little"), a Crestmont loan officer, the task of writing it up.  Little interviewed Levine and told him the loan could be approved but no other action could be taken on it until Seidman left FSA.  Little became involved with other things and gave the paperwork on the loan back to Bailey to complete.  Still assured that Seidman would soon be out of FSA, Bailey did extensive work on it.

Bailey prepared a Credit Summary for the Levine loan on February 21, 1991.[5]  On March 19, 1991, Bailey and Little approved the loan and issued a commitment letter to Levine.[6]

---

[5].  In the Credit Summary form there is a space headed "Bank Officers and Directors Interest."  Bailey says he thought this heading referred to the officers and directors of the Levine partnership, not FSA, the developer.  Bailey also listed the applicant as "[a] N.J. General Partnership, the ownership of which is 100% Steven K. Levine and Ned Levine."  Bailey App. at 321.  Clarence Hartwick, a twenty-seven year veteran in banking and an executive at First Fidelity Bank in New Jersey, corroborated Bailey's understanding at a hearing before an OTS ALJ.  He testified:

> That line refers to the borrower.  Is the borrower an officer or director of the bank, it's as simple as that.

Id. at 304.  Bailey entered the word "none" on the line calling for disclosure of "Bank Officers and Directors Interest."  Id. at 321.  Other underwriting documents included with the Credit Summary clearly disclosed FSA's interest.

[6].  The commitment was later modified and reissued on May 10, 1991.  Unknown to Bailey, Levine had already entered into a Contract of Sale with FSA on or about May 10, 1991.  Seidman did not formally withdraw from FSA until June 1, 1991.  Questioned about what would have happened if Seidman had failed to withdraw from a similar transaction, Crestmont's President, McClellan, testified, "We would not have closed the loan.  It was clearly

Levine did not sign the commitment letter until May 30, 1991, when Bailey was given a check for $2,000 in exchange for the commitment.[7]

### C.  Crestmont's Loan Policies

Crestmont had a loan policy which Bailey had authored. It was based on OTS regulations and stated:

> The policy of the bank is to carefully administer extensions of credit which are subject to special reporting requirements. These loans include the following:
>
> . . .
>
> – [L]oans to individuals or entities that conduct business or have conducted business with officers or directors of the bank.
>
> These situations are clearly described in the bank's loan committee credit summary. They are presented to the bank's Senior Loan Committee regardless of their size.

Id. at 314.  Crestmont had another policy, also based on OTS regulations, which forbade it from

> either directly or indirectly mak[ing] any loan to or purchase . . . any loan made to

(..continued)
understood by all involved that that was a condition to closing." Id. at 191.

[7]. Crestmont negotiated that instrument but the date of negotiation is unclear.  OTS contends that the check was negotiated before June 1, 1991, the date Seidman transferred his interest, but Bailey contends the check was cashed after Seidman relinquished his partnership.  Levine's delivery of the check for $2,000 resulted in a binding contract two days before Seidman's formal withdrawal.  See generally Restatement (Second) of Contracts § 17 (1981).

> any third party on the security of real property purchased from any affiliated person of the association unless the property was a single-family dwelling owned and occupied by the affiliated person as a permanent residence.

OTS Appendix ("OTS App.") at 96-97 (citing 12 C.F.R. § 563.43(c)(1)). Crestmont's policies also put on its directors

> a fundamental duty to avoid placing themselves in any position which creates, leads to or could lead to a conflict of interest or even the appearance of such conflict of interest between the accomplishment of the purposes of the association and the personal financial interests of the directors, officers and other affiliated persons.

Id. at 98-99 (citing 12 C.F.R. § 571.7). Specifically, Crestmont's directors were supposed to avoid any transaction in which

> a third party purchaser seeks to obtain a loan from the association secured by real estate acquired from the affiliated partnership or as to which the affiliated partnership holds a security interest.

Id. at 100. Bailey and Seidman were fully aware of these policies.

D.  The Garden Park Loan

At the same time that Crestmont was negotiating the Levine loan, Seidman and OTS were engaged in a tense dialogue over property owned by Garden Park Associates ("Garden Park"), for which Seidman was attempting to arrange financing at Crestmont.  Seidman had an interest in Garden Park and had also personally guaranteed the development loans for Garden Park. Seidman fully disclosed his interest in Garden Park to the Crestmont Board and Crestmont formally asked OTS to permit it to make the Garden Park loan.  On May 23, 1991, OTS denied Crestmont's request citing 12 C.F.R. § 563.43(c)(1) (1991) which forbade certain transactions with affiliated parties.[8]  Seidman contacted OTS's Chief Examiner in charge of Crestmont, Joseph Donohue ("Donohue"), for a further explanation of OTS's position. Donohue told Seidman that OTS considered the Garden Park loan impermissible so long as Seidman remained a guarantor of Garden Park's obligation.  Seidman asked for reconsideration, but OTS still refused to allow the loan.

---

[8].  OTS amended this regulation subsequent to the ALJ's decision, but the Code of Federal Regulations no longer contains any independent OTS conflict of interest rules.  Instead, 12 C.F.R. § 563.43 incorporates the Federal Reserve Board regulations found at 12 C.F.R. § 215 et seq.  See 57 Fed. Reg. 45,977 (1992) (codified at 12 C.F.R. § 563.43).  There is no provision in the Federal Reserve Board regulations comparable to former 12 C.F.R. § 563.43(c)(1).  For the text of former section 563.43(c)(1), see infra typescript at 44.

E. <u>Seidman's Release from the UJB Guarantee</u>

Until his May 23, 1991, conversation with Donohue, Seidman seems to have believed that his withdrawal from FSA would permit Crestmont to make the Levine loan. After speaking with Donohue about Garden Park, Seidman had second thoughts about his personal guarantee of FSA's loan from UJB and began to wonder whether it would disqualify Crestmont from loaning money to Levine even after Seidman completed his withdrawal from FSA. Seidman turned to James Poole ("Poole") of Poole & Co., who advised Seidman to get a release from the UJB guarantee and to discuss this with Risko. Seidman did so and Risko approached Eberhardt. Risko told Eberhardt that the conflict between Seidman's obligation on the guarantee and his fiduciary duties to Crestmont created problems in Crestmont's providing end–user financing for the FSA project. Eberhardt told Risko to put a proposal for Seidman's release in writing and UJB would consider it.

Events now moved rapidly. On May 30, 1991, the day Levine signed the commitment letter, Risko contacted Seidman and told him UJB would consider releasing Seidman. Risko suggested Seidman draft a letter asking for the release and that he, Risko, would sign a letter giving UJB the reasons for granting Seidman's request. Risko testified Seidman and he agreed that Seidman would do an initial draft of both the request for release and Risko's supporting letter. Risko testified he was only to approve and sign the supporting letter and that Seidman faxed him

the draft.  Seidman testified that Risko dictated the draft to Seidman's secretary and she forwarded it to Risko for review.

While drafts were being faxed back and forth between Risko and Seidman, OTS examiner Thomas Angstadt ("Angstadt") was at Crestmont on other business.  While using a Crestmont fax machine, Angstadt saw a copy of the draft of Risko's letter lying on a desk.  Angstadt secretly read and copied the draft.

The final version of Risko's letter was identical with the draft except for one sentence that Risko added.[9]  Seidman had no objection to Risko's addition.

On June 7, 1991, UJB notified Seidman that it would release him from his guarantee of FSA's loan.  Eberhardt later testified UJB understood that the release did not obligate

---

[9].  Risko's supporting letter reads as follows, with the sentence Risko added emphasized in bold face type:

> As you are aware, Mr. Seidman is the Chairman of the Board of Crestmont Federal Savings and Loan Association and Crestmont is entertaining financing certain condo purchasers who are purchasing units from Fulton Street.  His position as Chairman may make this financing impossible if he is also a partner in Fulton Street.  The inability to finance the end users, in our opinion, does not serve either United Jersey Bank's position or that of the developer.  At the present time, Crestmont is entertaining $700,000 in financing for two users and a third potential buyer has indicated the need for approximately $1 million in financing. **Crestmont would be willing to consider future financing of condo units in the Boonton area, assuming qualified buyers**.

OTS App. at 2 (emphasis added).

Crestmont to provide such financing, but he prepared a handwritten memo that indicated availability of end-user financing from Crestmont was a consideration in UJB's decision to release Seidman.

In the meantime, on June 3, 1991, OTS prohibited the Garden Park loan, and Seidman again asked Donohue for an explanation. Donohue now told Seidman that OTS believed conflict of interest prevented a thrift from making a loan to an entity in which an officer or director of the thrift had had an interest, including liability on a guarantee, at any time within two years before the loan was made. Seidman protested that such a policy had no support in OTS regulations, but Donohue was not moved.

Frustrated, Seidman ordered Bailey to stop considering commercial loans on projects in which Seidman had an interest either as a partner or guarantor. On June 4, 1991, Bailey sent both the Levine and the Garden Park loans to the Savings Bank of Rockland.[10] On June 5, 1991, OTS issued a supervisory directive forbidding Crestmont from making any commercial loans and launched the investigation for "conflict of interest" that gave rise to the cases now before us.[11] It is undisputed that Crestmont never made the loans OTS questioned.

---

[10]. Seidman is also a member of the Board of Directors at Rockland, but that lending institution is regulated by FDIC, not OTS.

[11]. The transfer of the loan documents took place one day before the OTS supervisory directive and three days before Seidman received word that he would be released from his guarantee of the UJB loan. Thus, neither the OTS order to cease commercial transactions nor the outcome of the UJB proceedings induced Crestmont's decision to transfer the loans.

## F.  The OTS Investigation, Charges and
## Seidman's District Court Action

Though Crestmont had made no prohibited loan and now proposed none, OTS went on with its investigation into what it suspected were violations of OTS's regulations on conflict of interest.  On September 13, 1991, OTS deposed Seidman, focusing on the draft letter Seidman had faxed to Risko.  Seidman never admitted writing the original draft of Risko's letter.  He said he believed that Risko had dictated it over the phone to Seidman's secretary, Janet Greenhill ("Greenhill").  Greenhill testified she did not remember these details.[12]  Seidman admitted that he had approved the text of the letter as sent with the additional sentence stating it would be in UJB's best interest to free him from the guarantee because that could open another source of end-user financing for FSA.

After he was deposed, Seidman learned that Risko and Poole & Co.'s records had been subpoenaed by OTS and that Risko planned to testify on deposition without an attorney.  Seidman called Risko to find out what Poole & Co.'s files contained concerning Seidman's request for a release from his guarantee and asked whether he could review the file.  Risko testified he told

---

[12].  Greenhill did testify it was her practice to put Seidman's initials on any letter he dictated to her and there were no such initials on the initial draft of Risko's letter.  She also testified it was not unusual for her to take dictation from others over the phone.

Seidman that he had a fax of the initial draft along with the fax sheets showing it was transmitted from Crestmont.

On September 16, 1991, before his OTS deposition, Risko met with Seidman. Seidman testified Risko told him he was going to tell OTS the letter was Seidman's idea. Seidman testified he told Risko this was a lie. Seidman said he reviewed the file and pulled out a number of documents relating to his request for a release. Risko testified Seidman asked him to "make sure that [the documents] get thrown away" and asked Risko to do his "best to make sure [the documents were] not around." Seidman Appendix ("Seidman App.") at 347-48. Risko also testified that Seidman told him to forget the documents ever existed. Seidman emphatically denies ever saying this. Both Risko and Seidman agree that Seidman told Risko he should tell OTS the truth.

Things grew tense. Risko left the room to speak with Poole. Seidman was left alone with the documents. Poole reentered the conference room, picked up the draft, crumpled it and left the room with it. Seidman followed Poole to his office where they had a heated exchange. Seidman grabbed the crumpled copy of the draft and tore it up. Seidman testified he did this "in a rage of anger" after learning Risko had made copies of all the relevant documents. Id. at 481-82. Risko testified he never informed Seidman that copies existed.[13]

---

[13]. The ALJ found Seidman destroyed the documents intentionally but "it was done in a fit of anger and not for the purpose of destroying material and relevant evidence." Seidman App. at 49. The Director's decision concluded cryptically that the ALJ found Seidman had destroyed material evidence. While the ALJ found

On October 30, 1991, OTS filed notice of charges against Seidman and Bailey.[14]  On the same day, it issued a preliminary Order of Suspension removing Seidman from his posts at Crestmont without pay.[15]  From April 20, 1992, through May 1, 1992, Treasury Department ALJ Walter Alprin ("Alprin") held hearings on the charges against Seidman and Bailey.  On August 13, 1992, Alprin issued his decision recommending that the Director issue a Removal and Prohibition Order permanently barring Seidman from any work in the banking field and assessing $930,000 in civil penalties against him.  Alprin also recommended an order directing Bailey to "cease and desist from engaging in

(..continued)
Seidman engaged in a number of culpable acts, it seems clear that the ALJ did not think destruction of evidence was one of them.

[14].  The OTS sought the following relief against Seidman:  (1) a preliminary order immediately suspending Seidman from his office at Crestmont and from further participating in Crestmont's affairs; (2) an order removing Seidman from his office at Crestmont and banning him from the banking industry; (3) disgorging any unjust enrichment or avoidance of loss; (4) providing a new guarantee to UJB on the FSA loan; (5) civil monetary penalties; and (6) any other relief the Director deemed appropriate.

[15].  Seidman commenced a district court action seeking a preliminary injunction to enjoin further enforcement of the Order of Suspension on February 7, 1992.  In his complaint, Seidman alleged that the Order of Suspension was facially invalid because it exceeded OTS's statutory authority.  On February 17, 1992, OTS filed a motion for dismissal under Federal Rule of Civil Procedure 12(b)(1), 12(b)(6), or, in the alternative, summary judgment under Federal Rule of Civil Procedure 56.  On May 22, 1992, the district court granted OTS's Rule 12(b)(1) motion and dismissed the Rule 12(b)(6) and Rule 56 motions as moot.  Because we will grant Seidman's petition for review and reverse the Director's order removing him from office and banning him from banking, we do not consider Seidman's appeal of the May 22, 1992 order.  See infra Part VII.

any unsafe or unsound practices in conducting the business of any financial institution . . . ."  Id. at 89.  Alprin did not recommend any monetary penalty against Bailey.

### G.  The Director's Decision

Seidman and Bailey sought the Director's review of the ALJ's recommended decision and asked for oral argument.  The Director denied the request for argument and issued a decision on December 4, 1992, finding against Seidman and issuing the Removal and Prohibition Order the ALJ had recommended.  The Director determined, however, that the record was not sufficient to support the recommended civil penalty of $930,000 against Seidman and remanded the case to the ALJ to take further evidence concerning Seidman's ability to pay.[16]  The Director also agreed with the ALJ's recommended findings of fact and conclusions of law as to Bailey and entered a Permanent Cease and Desist Order, but he disagreed with the ALJ's conclusion that no civil penalties were warranted against Bailey and sent Bailey's case back for further fact finding on money penalties.

In support of his order removing Seidman and banning him from banking, the Director found Seidman engaged in self-

---

[16].  On January 15, 1993, Seidman challenged the legality of the remand by filing a motion with the Director to stay further proceedings before the ALJ.  He also sought a stay from this Court.  We denied Seidman's request for a stay without stating whether our denial was on the merits or because Seidman had failed to exhaust his administrative remedies.  The motion before OTS remained undecided at the time Seidman filed his opening brief in this Court (March 1993).  We have not been advised of any subsequent action.

interested conduct by insinuating to UJB that a release from his FSA guarantee would cause Crestmont to provide end-user financing for FSA's Boonton project.  The Director also found that Crestmont unlawfully made a loan commitment to Levine while Seidman was still a partner in FSA.  Finding these acts of self-dealing were never disclosed to Crestmont's Board or the Senior Loan Committee, the Director held Seidman breached his fiduciary duties to Crestmont.  The Director also held Seidman violated OTS's conflict of interest provision, 12 C.F.R. § 571.7(b), and sought to benefit personally from these acts through the release from his FSA guarantee.

The Director independently held that Seidman's attempt to destroy evidence and cover-up his activities during the investigation violated section 1818(e)(1).  He found the attempted cover-up, which involved giving misleading testimony, destroying the original record of the fax of the early draft of Risko's letter from Seidman to Risko and requesting that Risko forget about the letter, inter alia, constituted an unsafe or unsound practice.  The Director concluded that these acts established personal dishonesty within the meaning of section 1818(e)(1)(C)(i) and conferred a personal benefit on Seidman within the meaning of section 1818(e)(1)(B)(iii).

The Director also held Bailey had engaged in an unsafe and unsound banking practice.  He found Bailey knew of Seidman's interest in FSA, failed to disclose it to the Board of Directors or the Senior Loan Committee and issued a commitment letter for the Levine loan before Seidman withdrew from FSA.  The Director

concluded this created an "abnormal risk of loss" to Crestmont and that a cease and desist order was appropriate under section 1818(b). Seidman App. at 121.

## II. Jurisdiction

The Director had jurisdiction over these proceedings pursuant to 12 U.S.C.A. § 1818(h)(1). Seidman and Bailey filed timely petitions for review pursuant to 12 U.S.C.A. § 1818(h)(2). Because of the Director's remand to an ALJ for further findings on Seidman's and Bailey's ability to pay civil penalties, we must consider whether their petitions seek review of a final order. Generally, an order which decides all issues of liability but remands on issues of damages is not immediately appealable. See Teledyne Continental Motors v. United States, 906 F.2d 1579, 1582 (Fed. Cir. 1990). Here the agency clearly contemplates further action concerning civil penalties. So long as the assessment of monetary penalties is pending, the full impact the Director's decisions may have on either Seidman or Bailey is uncertain.

> Under FDIA, parties sanctioned by OTS may obtain a review of any order . . . by the filing in the court of appeals of the United States for the circuit in which the home office of the depository institution is located . . . within thirty days after the date of service of such order, a written petition praying that the order of the agency be modified, terminated, or set aside. . . . Upon the filing of such petition, such court shall have jurisdiction, which upon the filing of the record shall . . . be exclusive, to affirm, modify, terminate, or set aside, in whole or in part, the order of the agency. Review of such proceedings shall

> be had as provided in chapter 7 of Title 5.
> The judgment and decree of the court shall be
> final, except that the same shall be subject
> to review by the Supreme Court upon
> certiorari . . . .

12 U.S.C.A. § 1818(h)(2) (West 1989).  Nothing in FDIA expressly states that the "order" must be a final one.  We recognized in Shea v. OTS, 934 F.2d 41 (3d Cir. 1991), however, "'there is a strong presumption that judicial review is only available when an agency action becomes final . . . .'"  Id. at 44 (quoting Bell v. New Jersey, 461 U.S. 773, 778 (1983)).  This presumption recognizes that postponement of review until final action can sometimes avoid the inefficiency of piecemeal review and, in some cases, make any review unnecessary.  CEC Energy Co. v. Public Serv. Comm., 891 F.2d 1107, 1112 (3d Cir. 1989); see also Fidelity Television, Inc. v. Federal Communications Comm'n, 502 F.2d 443, 448 (D.C. Cir. 1974) (quoting Chicago & Southern Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948) and Isbrandtsen Co. v. United States, 211 F.2d 51, 55 & n.24 (D.C. Cir.), cert. denied, 347 U.S. 990 (1954)).

In Shea we concluded, "in this Circuit, the finality of a disposition is determined by its consequences[,]" including "whether the OTS's decision 'imposes an obligation' or 'denies a right.'"  Shea, 934 F.2d at 44–45.  In CEC Energy we reasoned that "[a]pplication of the ripeness doctrine prevents the entanglement of the courts in administrative policy disagreements and protects the agencies from judicial interference until decisions are formalized and their effects felt in a concrete

way."  CEC Energy Co., 891 F.2d at 1109 (citation omitted).  We went on to state, "[t]he doctrine of ripeness requires an evaluation of the fitness of the challenged issue for review and the hardship to the parties of withholding judicial consideration."  Id. at 1109-10 (citation omitted); see also Federal Trade Comm'n. v. Standard Oil, Inc., 449 U.S. 232 (1980); Solar Turbines Inc. v. Seif, 879 F.2d 1073, 1080 (3d Cir. 1989) (concluding Supreme Court's finality standard incorporates ripeness standard).  An important but not dispositive factor is an agency's classification of its order as final.  Because finality is a pragmatic requirement informed but not decided by an agency classification of its decision, we looked at several other factors in CEC Energy:

> 1) whether the decision represents the agency's definitive position on the question; 2) whether the decision has the status of law with the expectation of immediate compliance; 3) whether the decision has immediate impact on the day-to-day operations of the party seeking review; 4) whether the decision involves a pure question of law that does not require further factual development; and 5) whether immediate judicial review would speed enforcement of the relevant act.

CEC Energy Co., 891 F.2d at 1110 (citing Solar Turbines Inc., 879 F.2d at 1080).  Thus, we turn to the facts that are material to our jurisdiction over Seidman's and Bailey's petitions for review.

Under the Director's order, Seidman is permanently removed from, and prohibited from returning to, the banking industry.  The order denies Seidman a right to pursue the trade

he has chosen. It also firmly concludes that Seidman is not fit to be a banker and that Bailey should be publicly reprimanded. The order notifies Seidman and Bailey of their right to petition for judicial review and the agency states it is final. Most significantly, the order demands immediate compliance and impacts immediately on Seidman's and Bailey's day-to-day affairs. OTS is currently enforcing the order precluding Seidman from taking part in the business of banking, and it is clear the agency has definitely decided to ban Seidman from that industry. Although the consequences to Bailey are not as harsh as those visited upon Seidman, the agency has indicated that it will engage in no further factual development or reconsideration of its order publicly directing Bailey to cease and desist from unsafe practices. The order has a continuing effect on Bailey's reputation and it too poses legal questions that can be fully reviewed at this time. In addition, Seidman's and Bailey's petitions pose questions that are mainly legal in nature and judicial review now is likely to facilitate the appropriate enforcement of applicable law.

Because assessment of any civil penalties hinges on the Director's conclusion that Seidman and Bailey violated FIRREA, we believe review at this juncture serves the interest of judicial economy. This case turns not on the civil penalties that are yet to be determined on the Director's remand to an ALJ but on the legality of the decisions the Director has already made. The Director's decision "'imposes . . . obligation[s]'" and "'denies. . . right[s].'" <u>Shea</u>, 934 F.2d at 44-45. Therefore,

we have jurisdiction under 12 U.S.C.A. § 1818(h)(2) to review the Director's order removing Seidman from his position at Crestmont and banning him permanently from the thrift industry, and directing Bailey to stop engaging in unsafe or unsound practices.[17]

### III.  Standard of Review

The Administrative Procedure Act ("APA"), 5 U.S.C.A. § 706(2) (West 1977), defines the scope of judicial review over the Director's findings and conclusions of law.  We must uphold the Director's order against Bailey and Seidman unless we determine that the Director has made an error of law or that his findings are not supported by substantial evidence on the whole record.  See Hoffman v. FDIC, 912 F.2d 1172, 1173–74 (9th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  Issues of law are subject to plenary review.  Dill v. INS, 773 F.2d 25, 28 (3d Cir. 1985).  In deciding legal issues, we must defer to an agency's consistent interpretation of the statute it administers unless it is "arbitrary and capricious,"

---

[17].  Our resolution of this issue of appealability is further supported by analogy to a district court proceeding in which one defendant had been enjoined from engaging in the banking business and a second defendant had been enjoined from engaging in unsafe and unsound banking practices.  The granting of the injunctions by the district court in this situation would be appealable under 28 U.S.C.A. § 1292(a)(1) (West 1993).  We conclude that the same injunctive effect of the civil penalties imposed on Seidman and Bailey argues in favor of permitting this appeal.

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984). Nevertheless, when "bizarre" interpretations of a statute are made out of "regulatory zeal," deference is not appropriate. See Wachtel v. OTS, 982 F.2d 581, 585 (D.C. Cir. 1992). Similarly, interpretations contrary to the plain meaning of the statute are unacceptable. Elliot Coal Mining Co., Inc. v. Director, OWCP, 17 F.3d 616, 629 (3d Cir. 1994). Seidman's due process attack on the statute in question, the merits issue to which we first turn, is subject to plenary review. United States v. Engler, 806 F.2d 425, 429 (1986).

## IV. Seidman's Due Process Challenge to the Statute

Seidman argues that 12 U.S.C.A. § 1818(e) violates due process because it fails to afford him a hearing before a fair and unbiased tribunal. He says a sanction so severe should not be entrusted to a person who has the combined functions of investigation, prosecution and adjudication. Although the Supreme Court has held that the Constitution requires administrative agencies to be fair and unbiased, see In re Murchison, 349 U.S. 133, 135-36 (1955), it has also held that the Constitution permits the investigative, prosecutorial and adjudicative roles to be combined in one agency. See Withrow v. Larkin, 421 U.S. 35, 46-47, 52-53 (1975). Agency administrators are presumed to be "'capable of judging a particular controversy fairly on the basis of its own circumstances.'" Id. at 55 (quoting United States v. Morgan, 313 U.S. 409, 421 (1941)). Seidman argues Withrow does not permit all three roles to be

combined in one person who also has the power to find facts and judge credibility without even hearing the witnesses.

The Director of OTS has the power to authorize an investigation, to determine whether charges should be brought, to issue notice of charges proffered and then to decide them as to law and fact. See 12 C.F.R. §§ 509.4, 509.18 (1993). Although OTS charges are usually heard by an ALJ, "[t]he Director may, at any time during the pendency of a proceeding perform, direct the performance of, or waive performance of, any act which could be done or ordered by the [ALJ]." Id. § 509.4. The ultimate decision is entirely the Director's and he is free to disregard not only the ALJ's legal conclusions but also the ALJ's findings of fact, including findings on credibility. See id. § 509.5(b)(7) (". . . only the Director shall have the power to grant any motion to dismiss the proceeding or to decide any other motion that results in a final determination of the merits of the proceeding . . . ."); id. § 509.40 (1993).

In Murchison, the Supreme Court held that a statutory scheme which gave a state judge power to sit as a grand jury, compel testimony, charge perjury and try and convict the persons charged violated due process. Murchison, 349 U.S. at 133-34. In Withrow, however, the Court stated, "Murchison has not been understood to stand for the broad rule that the members of an administrative agency may not investigate the facts, institute proceedings, and then make the necessary adjudications." Withrow, 421 U.S. at 53. In Withrow, the combination of functions under attack permitted Wisconsin's state board for the

examination of physicians to conduct investigative proceedings, institute charges, hold a hearing and adjudicate the charges. Id. at 54. The Supreme Court held that this combination of regulatory powers did not violate due process. It stated: "[T]here was no more evidence of bias or the risk of bias or prejudgment than inhered in the very fact that the Board had investigated and would now adjudicate." Id. (footnote omitted). The Supreme Court pointed out that the defendant and his counsel were permitted to be present throughout the investigation, counsel attended the hearings and counsel was aware of the facts presented to the board. Id. at 55. Ultimately, the Court required a showing of actual bias or at least a risk of bias and held neither was present under the Wisconsin scheme. Id.

In United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc., 787 F.2d 128 (3d Cir. 1986), aff'd by an equally divided court, 481 U.S. 735 (1987), we held that the provisions of the Multiemployer Pension Plan Amendments Act of 1980 governing procedure in administrative adjudications were unconstitutional because bias or a likelihood of bias is present when an agency's adjudicator has a fiduciary or fiscal stake in the decision. Id. at 139-40. But see Concrete Pipe & Prods. v. Construction Laborers Pension Trust for S. California, 113 S. Ct. 2264, 2276-78 (1993) (holding that even where an initial determination is made by a biased party, due process is met where there are provisions for a neutral de novo review and adjudication of all factual and legal issues). Consistent with Withrow's requirement of bias, we held

that the presumption that administrative decisionmakers are unbiased may be rebutted by a "'showing of conflict of interest or some other specific reason.'" Id. at 138 (quoting Schweiker v. McClure, 456 U.S. 188, 195 (1982)).

Seidman contends that Murchison, not Withrow, controls when the power of decision is vested in one individual instead of a multi-member board or commission. His argument implies that bias is inherent in such a process because it permits a single person to act as prosecutor, investigator and adjudicator as to the severe sanctions of section 1818(e). We think Withrow implies the contrary and actual bias or a likelihood of bias must appear if an otherwise valid administrative sanction is to be overturned because of a denial of due process. Though in Withrow a board, not a single person, combined the functions which the Director of OTS possesses under section 1818(e)(1), we do not think that distinction is controlling. In Withrow the Court stated:

> The risk of bias or prejudgment in this sequence of functions has not been considered to be intolerably high or to raise a sufficiently great possibility that the adjudicators would be so psychologically wedded to their complaints that they would consciously or unconsciously avoid the appearance of having erred or changed position. Indeed, just as there is no logical inconsistency between a finding of probable cause and an acquittal in a criminal proceeding, there is no incompatibility between the agency filing a complaint based on probable cause and a subsequent decision, when all the evidence is in, that there has been no violation of the statute. . . .

The initial charge or determination of probable cause and the ultimate adjudication have different bases and purposes. The fact that the same agency makes them in tandem and that they relate to the same issues does not result in a procedural due process violation. Clearly, if the initial view of the facts based on the evidence derived from nonadversarial processes as a practical or legal matter foreclosed fair and effective consideration at a subsequent adversary hearing leading to the ultimate decision, a substantial due process question would be raised. But in our view, that is not this case.

Withrow, 421 U.S. at 57-58 (footnote omitted).[18] Any interest the Director might have in sustaining his own charges is no different than the board had in Withrow. Seidman has not shown bias or a likelihood of bias.[19] His due process argument fails. We therefore turn to the substantive requirements of the statutes which Bailey and Seidman were charged with violating. We begin with the charges against Bailey because their consideration will

_____

[18]. Congress, however, has expressed concern over the exercise of the power to remove a banker from office and ban him or her from the industry:

> [T]he power to suspend or remove an officer or director of a bank or savings and loan association is an extraordinary power, which can do great harm to the individual affected and to his institution and to the financial system as a whole. It must be strictly limited and carefully guarded.
>
> Accordingly, the committee adopted language which . . . imposes the further requirement that the violation or practice must be "one involving personal dishonesty on the part of [the] director or officer."
>
> With this limitation, and with the opportunity given to seek judicial review of suspension or removal orders . . . the committee concluded that the danger of abuse of the power has been reduced to the minimum.

S. Rep. No. 1482, 89th Cong., 2d Sess. (1966), reprinted in 1966 U.S.C.C.A.N. 3532, 3539; see also 112 Cong. Rec. 24984 (1966) (remarks of Rep. Patman concerning possible agency abuse of "unsafe or unsound practice" provision).

[19]. Seidman contends various OTS officials may be biased against him, see Brief of Petitioner Seidman at 11 n.12 (explaining adversarial history with OTS), but he points to no specific facts tending to show that Director Ryan, the decisionmaker, was biased.

require us to analyze some of the same concepts that underlie the more serious charges against Seidman.

## V.  The Charges Against Bailey

Section 1818(b)(1) prohibits unsafe and unsound practices.  OTS argues that Bailey's commitment to the Levine loan conflicts with Crestmont's policy of prohibiting purchase money loans on the security of real property in which a Crestmont officer or director had an interest.  An officer's violation of a banking institution's policy, however, is not enough to justify a cease and desist order under section 1818(b)(1).  While the statute gives the Director considerable discretion, it nevertheless requires substantial evidence showing that the violation of policy amounted to an unsafe and unsound practice.

> Section 1818(b)(1) provides:
> If, in the opinion of the appropriate Federal Banking Agency . . . any institution-affiliated party . . . has engaged . . . in an unsafe or unsound practice in conducting the business of [a] depository institution, . . . the agency may issue and serve upon the . . . party a notice of charges in respect thereof. . . .  [I]f upon the record made at . . . [a] hearing, the agency shall find that any . . . unsafe or unsound practice specified in the notice of charges has been established, the agency may issue and serve upon . . . the institution-affiliated party an order to cease and desist from any such . . . practice.

12 U.S.C.A. § 1818(b)(1).[20]

---

[20]. Bailey and Seidman are institution-affiliated parties.  See 12 U.S.C.A. § 1813(u)(1) (West 1989).

Because the statute itself does not define an unsafe or unsound practice, courts have sought help in the legislative history.  See, e.g., Northwest Nat'l Bank v. United States, 917 F.2d 1111, 1115 (8th Cir. 1990); Gulf Federal Sav. & Loan Ass'n v. Federal Home Loan Bank Bd., 651 F.2d 259, 264 (5th Cir. 1981), cert. denied, 458 U.S. 1121 (1982).  In hearings before Congress prior to its adoption in the Financial Institutions Supervisory Act of 1966, Pub. L. No. 89-695 (1966) John Horne, Chairman of the Federal Home Loan Bank Board ("FLHBB"), OTS's predecessor, testified:

> Generally speaking, an "unsafe or unsound practice" embraces any action, or lack of action, which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds.

Financial Institutions Supervisory Act of 1966: Hearings on S. 3158 and S. 3695 Before the House Committee on Banking and Currency, 89th Cong., 2d Sess. 49-50 (memorandum submitted by John Horne) (citations omitted).  Thus, courts have generally interpreted the phrase "unsafe or unsound practice" as a flexible concept which gives the administering agency the ability to adapt to changing business problems and practices in the regulation of the banking industry.  See Groos Nat'l Bank v. Comptroller of the Currency, 573 F.2d 889, 897 (5th Cir. 1978) ("The phrase 'unsafe or unsound banking practice' is widely used in the regulatory statutes and in case law, and one of the purposes of the banking

acts is clearly to commit the progressive definition and eradication of such practices to the expertise of the appropriate regulatory agencies.").

Among the specific acts that may constitute an unsafe and unsound practice are "paying excessive dividends, disregarding a borrower's ability to repay, careless control of expenses, excessive advertising, and inadequate liquidity." Gulf Federal Sav. & Loan Ass'n, 651 F.2d at 264. In Gulf Federal, the court had to decide whether a bank's breach of contract was an unsafe or unsound practice that justified an FHLBB order to cease and desist. Id. at 262. The FHLBB concluded that the bank's potential liability for breach and possible "loss of public confidence in the institution" meant the breach was an unsafe and unsound practice that authorized the agency to order the bank to perform its contract. Id. at 264. The court disagreed and held that a breach of contract is not an unsafe or unsound practice that threatens a bank's financial soundness. Id. The court expressly rejected FHLBB's conclusion that liability for breach and consequent loss of public confidence in the bank's willingness to honor its commitments give rise to an unsafe or unsound practice that authorized a cease and desist order. Id. It stated:

> Such potential "risks" bear only the most
> remote relationship to [the bank's] financial
> integrity and the government's insurance
> risk. . . . We fail to see how the [FHLBB]
> can safeguard [the bank's] finances by making
> definite and immediate an injury which is, at
> worst, contingent and remote.

> Approving intervention under the
> [FHLBB's] "loss of public confidence"
> rationale would result in open-ended
> supervision. . . . The [FHLBB's] rationale
> would permit it to decide, not that the
> public has lost confidence in [the bank's]
> financial soundness, but that the public may
> lose confidence in the fairness of the
> association's contracts with its customers.
> If the [FHLBB] can act to enforce the
> public's standard of fairness in interpreting
> contracts, the [FHLBB] becomes the monitor of
> every activity of the association in its role
> of proctor for public opinion.  This departs
> entirely from the congressional concept of
> acting to preserve the financial integrity of
> its members.

Id. at 264-65 (footnote omitted).

In Northwest National Bank the court upheld the
Comptroller of the Currency's ("Comptroller's") conclusion that
evidence showing failure to maintain an adequate loan to loss
reserve and inadequate capital, together with deficient loan
administration, established unsafe or unsound banking practices.
Northwest Nat'l Bank, 917 F.2d at 1113-14.  The court agreed with
FHLBB that the bank's failure to maintain adequate reserves and
capital was an unsafe or unsound practice.  Id. at 1115.  The
court defined the phrase "unsafe and unsound banking practices"
in general terms similar to those that appear in the legislative
history:  "Unsafe and unsound banking practices are . . .
'conduct deemed contrary to accepted standards of banking
operations which might result in abnormal risk or loss to a
banking institution or shareholder.'"  Id. (quoting First Nat'l
Bank of Eden v. Department of the Treasury, 568 F.2d 610, 611 n.2

(8th Cir. 1978) (per curiam)). The court in Northwest National Bank decided that the poor state of the bank's loan portfolio and the insufficient level of its capital and reserves permitted an inference that unsafe lending practices had occurred. Id. Accordingly, it upheld the Comptroller's finding that the bank had engaged in unsafe and unsound banking practices. Id. at 1115-16; see also First Nat'l Bank of Eden, 568 F.2d at 611 (upholding Comptroller's issuance of cease and desist order for unsafe and unsound banking practices when record showed accumulation of unsafe assets, inadequate internal controls and auditing procedures, lack of credit information on certain bank investments in violation of federal regulations and payment of excessive bonuses to bank officers).

In MCorp Financial, Inc. v. Board of Governors, 900 F.2d 852 (5th Cir. 1990), aff'd in part, rev'd in part on other grounds, 112 S. Ct. 459 (1991), the Board of Governors of the Federal Reserve concluded that MCorp's failure to provide capital to its subsidiary banks was an unsafe or unsound practice and entered a cease and desist order directing MCorp to transfer assets to its banking subsidiaries. MCorp Fin., Inc., 900 F.2d at 862. On review, the court of appeals concluded that Congress had failed to provide a clear definition of "unsafe or unsound practice." Id. at 862. Limited by Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), but relying on Gulf Federal Savings & Loan Association, the court concluded that the Board of Governors' order directing MCorp to transfer assets to its troubled subsidiaries was itself contrary

to "'generally accepted standard[] of prudent operation.'" Id. at 863 (quoting Gulf Federal Sav., 651 F.2d at 254). "Such a transfer of funds would require MCorp to disregard its own corporation's separate status; it would amount to a wasting of the holding company's assets in violation of its duty to its shareholders." Id.

We think at least one common element of an unsafe or unsound banking practice relating to the health of the institution can be deduced from these cases and the legislative history. The imprudent act must pose an abnormal risk to the financial stability of the banking institution. This is the standard that the case law and legislative history indicates we should apply in judging whether an unsafe or unsound practice has occurred.

With this in mind, we turn to the specific imprudent acts OTS charges against Bailey. They are:

> (a) failing to disclose Seidman's interest in Fulton Street Associates to the Senior Loan Committee . . ., (b) approving the Levine Loan without presenting the loan for review to Crestmont's Senior Loan Committee . . ., and (c) approving the Levine Loan even though Bailey knew that Seidman had an interest in Fulton Street Associates.

Bailey App. at 20. Only one of them has any potential for causing Crestmont loss--Bailey's premature issuance of the commitment letter.[21]

---

[21]. The first two grounds relied upon by the Director--a failure to disclose Seidman's interest in FSA to the Senior Loan Committee and Bailey's approval of the loan without submitting it

When Bailey issued the commitment letter, he made Crestmont responsible for the Levine loan.  He did this despite the fact that Seidman had not extricated himself from the FSA partnership or from the UJB guarantee.  When Levine accepted the commitment, Crestmont remained ineligible to make the loan.  Thus, Crestmont became responsible for the loan despite the potential illegal conflict.  We think this act was imprudent.  Although all parties testified that their understanding was that the loan would not go through absent Seidman's complete withdrawal, Bailey had nevertheless obligated Crestmont to a loan it might not be able to make.  Obligating one's institution to transactions that might be illegal is not in accord with "generally accepted standards of prudent operation."  See MCorp Fin., Inc., 900 F.2d at 862.  After Levine accepted the commitment letter, Crestmont either had to make the loan, breach the agreement to make it or place the loan with another institution regardless of Seidman's position.  Although, as it turned out, Crestmont was able to place the loan without incident or loss, we recognize that a risk was present when Bailey issued the commitment.  Obliging an institution to choose between

(..continued)
to the Senior Loan Committee--were not material to Bailey's act of approving the loan and issuing a commitment letter.  The record establishes that all the members of the Senior Loan Committee were fully aware of Seidman's interest and had agreed that the Levine loan was not to be approved until Seidman fully disassociated himself from FSA.  Moreover, reliance on the omission of Seidman's interest on the Credit Summary form is misplaced.  Undisputed testimony supported Bailey's claim that the entry on the form referred to an affiliated party's interest in the borrower.  See supra note 5.

covering fluctuations in the interest rate, engaging in an illegal transaction or breaching a binding agreement is not prudent.

Imprudence standing alone, however, is insufficient to constitute an unsafe or unsound practice. A cease and desist order is designed to prevent actions that if repeated would carry a potential for serious loss. Although issuance of even this single commitment exposed Crestmont to some potential risk of loss, that potential risk did not begin to approach the abnormal risk involved in Northwest National Bank, where the bank was exposed to a serious threat to financial stability by its general failure to monitor its loans adequately and to maintain adequate reserves and capital. The potential loss to which Bailey subjected Crestmont is rather like that present in Gulf Federal. Contingent, remote harms that could ultimately result in "minor financial loss[es]" to the institution are insufficient to pose the danger that warrants cease and desist proceedings. Gulf Fed. Sav. & Loan Ass'n, 651 F.2d at 264. Though it is not particularly onerous to require a loan officer to satisfy himself that the institution may legally make a loan before the commitment is issued, we cannot conclude that the commitment Bailey authorized posed such an abnormal risk that Crestmont's financial stability was threatened.

We hold that Bailey's approval of the Levine loan and the commitment he issued on behalf of Crestmont in violation of its policies, while imprudent, did not pose an abnormal risk to Crestmont's financial stability and therefore was not an unsafe

or unsound practice within the meaning of section 1818(b).
Accordingly, we will grant Bailey's petition for review and
vacate the part of the Director's order pertaining to Bailey.

## VI.  The Charges Against Seidman

Courts have recognized that the power to remove a bank
officer is an extraordinary power that should be carefully
exercised in strict accordance with the law.  Cf. Manges v. Camp,
474 F.2d 97, 100-01 (5th Cir. 1973).  Accordingly, we might
expect that the statute under which OTS sought the far more
serious sanction of Seidman's removal from office and his
permanent prohibition from participation in the thrift industry,
12 U.S.C.A. § 1818(e), requires elements additional to those that
justify the lesser sanction of a cease and desist order.  We are
not disappointed.  By requiring a three part conjunctive test in
section 1818(e)(1), Congress has imposed significant additional
conditions before a banker can be deprived of his office and
permanently barred from banking.  Thus, before an agency
regulating a banking institution can impose this ultimate
administrative sanction on any banker, it must show by
substantial evidence that:  (1) the banker has committed an
unlawful act; (2) the act has either an adverse effect on the
regulated institution or its depositors or confers a benefit on
the actor and (3) the act is accompanied by a culpable state of
mind.[22]  See Oberstar v. FDIC, 987 F.2d 494, 500 (8th Cir. 1993).

---

[22].  The full text of section 1818(e)(1) is:

(..continued)

          (1) . . .  Whenever the appropriate Federal banking agency determines that--

              (A) any institution-affiliated party has, directly or indirectly--

                 (i) violated--

                    (I) any law or regulation; . . .

                 (ii) engaged or participated in any unsafe or unsound practice in connection with any insured depository institution or business institution; or

                 (iii) committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty;

              (B) by reason of the violation, practice, or breach described in any clause of subparagraph (A)--

                 (i) such insured depository institution or business institution has suffered or will probably suffer financial loss or other damage;

                 (ii) the interest of the insured depository institution's depositors have been or could be prejudiced; or

                 (iii) such party has received financial gain or other benefit by reason of such violation, practice, or breach; and

              (C) such violation, practice, or breach--

                 (i) involves personal dishonesty on the part of such party; or

The acts come in three varieties.  The effects also divide into three subclasses, but there are only two kinds of culpable mental states.  Under section 1818(e)(1), at least one of the prohibited acts, accompanied by at least one of the three prohibited effects and at least one of the two specified culpable states of mind, must be established by substantial evidence on the whole record before the regulatory agency can properly remove a person from office and ban him from the banking or thrift industries.  Id.

The Director concluded five separate charges warranting the sanction of removal and prohibition were proven against Seidman:  (1) acting to gain release from the UJB loan; (2) failing to notify Crestmont's Senior Loan committee of his interest in FSA and the Boonton project; (3) destroying material information during the investigation; (4) giving misleading testimony in a deposition; and (5) instructing a material witness to withhold evidence.  We will examine the record as to each to see if the evidence relevant to each meets the statutory requirements we have just described.

A.  Seidman's Release From His Guarantee on the UJB Loan
    1.  Did Seidman Violate "Any Law or Regulation" in Seeking the Release?

(..continued)

> (ii) demonstrates willful or continuing disregard by such party for the safety or soundness of such insured depository institution or business institution.

12 U.S.C.A. § 1818(e)(1) (West 1989).

On the first charge, we begin with the particular acts described in section 1818(e)(1)(A). If Seidman's effort to secure a release from the UJB guarantee is not among the three kinds of acts section 1818(e)(1)(A) prohibits, we need not consider any of the particular effects section 1818(e)(1)(B) specifies or either of the culpable states of mind section 1818(e)(1)(C) describes because the elements of act, effect and state of mind are conjunctive. Oberstar, 987 F.2d at 500. Each must be established by substantial evidence before the Director may issue an order of removal and prohibition under the statute.

OTS contends Seidman acted in violation of "law or regulation" under section 1818(e)(1)(A)(i)(I) when he and Risko took steps to secure Seidman's release from his guaranty of FSA's indebtedness to UJB. The ALJ concluded that Seidman violated 12 C.F.R. § 563.43 in securing his release from the UJB guarantee.[23] Section 563.43 made it improper for a savings association to "[m]ake any loan to . . . any third party on the security of real property purchased from any affiliated person of such association, unless the property was a single-family dwelling owned and occupied by the affiliated person as his or her principal residence." 12 C.F.R. § 563.43(c)(1) (1991) (since repealed).[24] Seidman argues section 563.43(c)(1) does not apply because it expressly requires consummation of a loan, and

---

[23]. In his opinion the Director does not expressly find a violation of section 1818(e)(1)(A)(i)(I) on this ground, but his acceptance of the ALJ's recommendation implies he did.

[24]. See supra note 8.

Crestmont never granted any prohibited loan.  We agree with

Seidman.[25]

The Director also held, however, that Seidman violated

12 C.F.R. § 571.7, and that violation met section

1818(e)(1)(A)(i)(I)'s requirement of a prohibited act because it

was a violation of a "regulation."  Seidman argues that section

571.7 is a policy statement, not a regulation, and therefore any

violation of it did not meet section 1818(e)(1)(A)(i)(I)'s

requirement.  Section 571.7 is expressly labeled a "Statement of

Policy" and reads, in relevant part:

> [E]ach director, officer, or other affiliated
> person of a savings association has a
> fundamental duty to avoid placing himself or
> herself in a position which creates, or which
> leads to or could lead to, a conflict of
> interest or appearance of a conflict of
> interest. . . .

12 C.F.R. § 571.7(b) (1993).  OTS's predecessor, FHLBB,

consistently drew a distinction between "general statements of

policy" and substantive regulations.  <u>See</u> 12 C.F.R. §§ 508.11,

508.12, 508.14 (1989).[26]  The enactment of FIRREA does not remove

this distinction because the APA, 5 U.S.C.A. § 553(b)(A) (West

1977), requires more exacting procedures of notice and comment

for the promulgation of rules that have the force of law than it

---

[25].  Indeed, in his brief and argument on Seidman's petition for review, the Director appears to place little, if any, reliance on this regulation.

[26].  After enactment of FIRREA, OTS amended the old FHLBB regulations.  The version applicable to Seidman's case, however, is the FHLBB version.

does for statements of policy. A regulated person's failure to follow the guidance of a policy statement is not sanctionable under section 1818(e)(1)(A)(i)(I) unless it is also shown that the failure to follow the policy violated some specific statute, rule or regulation that has the force of law:

> [C]ourts are in general agreement that interpretive rules simply state what the administrative agency thinks the statute means, and only "remind" affected parties of existing duties. In contrast, a substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties.

Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm., 874 F.2d 205, 207 (4th Cir. 1989) (citations omitted); see also FLRA v. Dep't of the Navy, 966 F.2d 747, 762 (3d Cir. 1992) (in banc); Northwest Nat'l Bank, 917 F.2d at 1117. The United States Court of Appeals for the District of Columbia has observed:

> A general statement of policy . . . does not establish a binding norm. It is not finally determinative of the issues or rights to which it is addressed. When the agency applies the policy in a particular situation, it must be prepared to defend it, and cannot claim that the matter is foreclosed by the prior policy statement.

Guardian Federal Sav. & Loan Ass'n v. FSLIC, 589 F.2d 658, 666 (D.C. Cir. 1978) (internal quotation and citation omitted).

FHLBB issued section 571.7 as a caution against the risk that is added when an affiliated person like Seidman has a personal stake in a business transaction his savings institution

is considering, a risk inherent in self-dealing. See generally First Nat'l Bank v. Smith, 610 F.2d 1258, 1265 (5th Cir. 1980). The FHLBB first announced section 571.7 in 1968 as a policy without giving interested persons any opportunity for comment. See 33 Fed. Reg. 16,382 (1968) (codified at 12 C.F.R. § 571.1). In 1975, the FHLBB published a request for comment on a number of conflict of interest proposals that had been adopted on November 19, 1970. It included section 571.7. See 35 Fed. Reg. 12,216, 18,038 (1975). Nevertheless, section 571.7 continued to appear in a section of C.F.R. entitled "Statements of Policy." Accordingly, Seidman argues it is wrong to take away a person's livelihood under a provision promulgated, codified and described as a policy statement rather than as a rule or regulation having the force of law.

In Northwest National Bank the bank was charged with violating 12 C.F.R. § 7.3025 (1987). Northwest Nat'l Bank, 917 F.2d at 1116. The court concluded that the rule was legislative in nature because it "clearly purports to create new substantive requirements." Id. at 1117. It considered several factors, including the text of the rule and the procedure the agency had used to promulgate it, in deciding whether it was "interpretive" or "legislative" in nature. Id. at 1116-17. The rule's classification as "interpretive" was an important but not dispositive factor. Id.

The legislative rule the court in Northwest National Bank considered is materially different from section 571.7, which imposes no specific substantive requirements. Moreover,

Northwest National Bank's failure to follow 12 C.F.R. § 7.3025 plainly led to a violation of the statute itself. Id. at 1116 ("The Comptroller found Northwest in violation of [the regulation] and thereby in violation of 12 U.S.C. § 29.").

In addition, the text of section 571.7 does not support OTS's position. Section 571.7 has not changed since it was first published as a policy statement. OTS has since promulgated regulations with the force of law prohibiting specific conflicts of interest. They would be redundant if section 571.7's general statement independently has the force of law. See, e.g., 12 C.F.R. §§ 563.40, 563.41, 563.43 (1993).

Considering the Northwest National Bank factors together, we hold section 571.1(b), whose text, title and codification as a policy statement have never changed, is just that--a policy statement, not a regulation.[27] Congress and the agencies that regulate lending institutions have specifically prohibited particular acts as conflicts of interest in statutes, rules and regulations that plainly do have the force of law.[28] Congress and the regulators have shown that they know how to

---

[27]. We need not and do not decide that FIRREA does not give OTS the authority to expand the duty of loyalty officers of banking corporations OTS regulates owe their institutions from actual conflicts of interest to appearances of conflict, but we do hold that if it wishes to assert such authority its intent to do so must be more clearly expressed than it is in section 571.7.

[28]. Nothing about policy statements in general nor section 571(b) in particular would indicate to persons who might be affected by them that violation of the policy against apparent conflicts could subject them to an order banning them from the trade or profession they work in.

define specific conduct that gives rise to an illegal conflict of interest. We think the sweeping language of section 571.7(b) indicates it is no more than a statement of policy that a director of a banking institution, like Seidman, should use as a guide for personal conduct, not a rule whose violation triggers the severe penalty section 1818(e) imposes. Accordingly, we reject the Director's conclusion that section 571.7(b)'s "Statement of Policy" is a "regulation or law" within the meaning of section 1818(e)(1)(A)(i)(I).

> 2. <u>Did Seidman Engage in an Unsafe or Unsound Practice by Seeking the Release?</u>

Because Seidman did not act in violation of a law or regulation as required by section 1818(e)(1)(A)(i)(I) when he sought the release, we next consider whether by doing so he engaged in an unsafe or unsound practice under section 1818(e)(1)(A)(ii). The Director summarily concluded that Seidman's conduct in seeking a release from the UJB guarantee without informing the Board or the Senior Loan Committee of his interest in FSA, the second charge against him, constituted an unsafe or unsound practice. OTS urges us to affirm this holding.

> As stated previously, an "unsafe or unsound practice" embraces any action, or lack of action, which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk of loss or damage to an institution, its shareholders, or the agencies administering the insurance funds.

MCorp Fin., Inc., 900 F.2d at 862 (quotation omitted). An unsafe or unsound practice has two components: (1) an imprudent act (2) that places an abnormal risk of financial loss or damage on a banking institution. See supra Part V. OTS contends that Seidman's conduct in seeking a release from his UJB guarantee and failing to inform the Board or the Senior Loan Committee of his interest meets these requirements.

OTS and the Director equate the imprudence component of an unsafe or unsound practice with a breach of the fiduciary duty of due care, once called the "prudent man rule" and now more often described as the "business judgment" rule. See Revised Model Business Corporation Act ("RMBCA") § 8.30 comment (1992). In its brief, OTS asserts "[t]he prudent operation of Crestmont certainly requires that its directors and officers comply with OTS regulations concerning conflicts of interest as well as Crestmont's own policy governing conflicts." Appellee Brief at 31.[29]

While the same act may be both an unsafe or unsound practice under section 1818(e)(1)(A)(ii) and a breach of a fiduciary duty under section 1818(e)(1)(A)(iii), we hesitate to make one a proxy for the other.[30] If OTS seeks to prove a

---

[29]. OTS also relies on Hoffman v. FDIC, 912 F.2d 1172 (9th Cir. 1990), but that case dealt with self-dealing, a breach of the fiduciary duty of loyalty, not the fiduciary duty of care.

[30]. Congress obviously thought the concepts were distinct enough to require separate specification in section 1818(e)(1)(A). Here, we need not consider the details of any overlap between acts that are unsafe or unsound practices and those that are breaches of fiduciary duty because we apply different tests to determine which category applies to any particular act. It is

violation of section 1818(e)(1)(A)(ii), it must satisfy the definition of an unsafe or unsound practice. Conversely, if OTS wishes to prove a violation of section 1818(e)(1)(A)(iii), it must do so under the standards that define a fiduciary's duty. Our present inquiry is only whether the first charge against Seidman concerning his successful efforts to obtain a release from his guarantee of FSA's obligations to UJB was an unsafe and unsound practice. So considered, we conclude Seidman's attempt to secure a release was not an unsafe and unsound banking practice with respect to Crestmont. OTS not only placed Seidman in the position of selecting between his business life and his banking life but also compelled him to deprive Crestmont of potentially desirable loans. OTS told Seidman he had to relinquish his outside interests and disengage himself from the obligations he had incurred while a partner in FSA and then, when he did so, charged him with an unsafe and unsound practice. Seidman's successful effort to secure a release from his guarantee was potentially beneficial to Crestmont by giving it an added source of desirable loans. The record does not support a conclusion that Seidman's attempts to extricate himself from the UJB guarantee were contrary to accepted banking practices for persons acting on behalf of Crestmont.

(..continued)
important, however, in deciding cases and in imposing sanctions to separately compare the act under consideration with all the elements of each category. The Director's failure to do so is a source of many of the problems and much of the confusion in this case.

Even if we were to conclude that Seidman behaved imprudently in seeking the release, OTS would still have to show that his actions created an abnormal risk of financial loss for Crestmont. See supra Part V. Unable to identify any specific harm to Crestmont, OTS argues, "if directors are free to make choices for the institutions they control based on the personal benefit that would result from their choice there would be an inherent risk that the interests of the depositors and the institution would take a back seat to the personal interest of the director." Appellee App. at 31. OTS again fails to recognize any distinction between the separate requirements of section 1818(e). Its argument conflates the act of engaging in an unsafe practice with the prohibited effect of personal gain. Compare 12 U.S.C.A. § 1818(e)(1)(A)(ii) with id. § 1818(e)(1)(B)(iii). This record does not show that Seidman's attempt to obtain relief from his guarantee and free Crestmont from OTS's prohibition against end-user financing on FSA's Boonton development created an abnormal risk of loss or damage to Crestmont. We therefore turn to section 1818(e)(1)(A)(iii).

### 3. Did Seidman Violate Any Fiduciary Duty
### In Seeking the Release?

In a final attempt to demonstrate that Seidman's release from the UJB guarantee was an "act" under section 1818(e)(1)(A) and therefore one of the three elements needed to justify a removal and prohibition order, OTS argues that the Director correctly concluded that Seidman's efforts to secure his

release constituted self-dealing and violated his fiduciary duty of loyalty to Crestmont under section 1818(e)(1)(A)(iii).[31] As a member of the board and an officer of Crestmont, Seidman did owe a duty of loyalty to Crestmont. Section 8.42 of the RMBCA states:

> (a) An officer with discretionary authority shall discharge his duties under that authority:
>
>> (1) in good faith;
>>
>> (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and
>>
>> (3) in a manner he reasonably believes to be in the best interests of the corporation.

RMBCA § 8.42 (1992). Common law also imposes on a director a duty of loyalty to the corporation served. See Fleishacker v. Blum, 109 F.2d 543, 547 (9th Cir.), cert. denied, 311 U.S. 665 (1940). The duty of loyalty includes a duty to avoid conflicts of interest. See Pepper v. Litton, 308 U.S. 295, 306, 310-11 (1939).

In In re Bush, OTS AP 91-16, 1991 OTS DD LEXIS 2 (April 18, 1991), the Director discussed both a director's duty

---

[31]. The Director also concluded that Seidman breached his duty of candor when he failed to inform the Senior Loan Committee or the Crestmont Board of his interest in FSA before the Levine loan commitment. This argument is addressed infra at Part VI.B. The Director did not conclude either of these acts violated Seidman's fiduciary duty of care, only the duty of loyalty.

of loyalty and the initial inquiry of whether a director has a

conflicting interest in a transaction:

> A fundamental component of the fiduciary
> duties of directors in every jurisdiction,
> however, is that directors owe a duty of
> loyalty to the institution they serve.  This
> duty prohibits directors from engaging in
> transactions that involve conflicts of
> interest with the institution. . . .

> \*   \*   \*

> The threshold inquiry in assessing
> whether a director violated his duty of
> loyalty is whether the director has a
> conflicting interest in the transaction.
> Directors are considered to be "interested"
> if they either "appear on both sides of a
> transaction []or expect to derive any
> personal financial benefit from it in the
> sense of self-dealing, as opposed to a
> benefit which devolves upon the corporation
> or all stockholders generally."

In re Bush, OTS AP 91-16 at 11, 15-16, 1991 OTS DD LEXIS at \*18,

\*21 (footnote and citations omitted).  The RMBCA defines a

director's conflicting interest transaction as "a transaction

effected or proposed to be effected by the corporation . . .

respecting which a director of the corporation has a conflicting

interest."  RMBCA § 8.60(2) (1992).  Perhaps because this

definition tautologically defines the defined in terms of itself,

the Commissioners, in commentary, observed that "[t]o constitute

a director's conflicting interest transaction, <u>there must first</u>

<u>be a transaction by the corporation, its subsidiary, or</u>

<u>controlled entity in which the director has a financial</u>

<u>interest.</u>"  RMBCA § 8.6 comment 2(1) (emphasis added).

As Seidman points out, Crestmont never granted any loan secured by property whose sale could reduce Seidman's obligation on his guarantee or UJB's exposure on its loan to FSA, nor did Seidman ever promise anyone that Crestmont would make such loans in exchange for his release. OTS clearly suspected that Seidman promised UJB Crestmont's favorable consideration for end-user loans on FSA properties in return for UJB's release. Suspicion is not enough, however, and OTS's suspicion that Seidman had promised he would use his position at Crestmont to insure end-user financing on the FSA project is not supported by substantial evidence. Risko's letter does not show any such quid pro quo in either of its versions. Indeed, if we accept the Director's finding that Seidman prepared the original draft, the version of the evidence most favorable to OTS, it appears that Risko took pains to make it clear to UJB that no quid pro quo was promised in the version Risko finally sent to UJB without any objection from Seidman. The evidence on this record is just as consistent with a finding that UJB released Seidman because Crestmont was a good prospect for the end-user financing it needed to reduce its own exposure on a worrisome project as it is with the conclusion that UJB granted the release in exchange for Seidman's unlawful promise to use his influence to obtain Crestmont's approval of loans that would reduce its exposure on FSA's Boonton project and to favor end-user loans on the Levine property or any other property in the Boonton project.[32]

---

[32]. Additional evidence which supports a conclusion that UJB's recognition that Crestmont could not lawfully supply end-user

OTS's position puts Seidman in a "Catch-22."  If he remained liable on his guarantee to UJB, Crestmont would be unable to consider potentially profitable end-user loans on the Boonton project; but when Seidman acted to secure a release from the guarantee, he subjected himself to removal from Crestmont's Board.  The only way Seidman could avoid the conflict of interest that OTS saw in his relation to FSA was to extricate himself from the FSA partnership and all the entanglements it entailed, including the guarantee.  This record shows that this is what he did.  Moreover, when we consider the whole record, as we must, we see substantial evidence that Seidman did not act as he did to benefit himself at Crestmont's expense, but rather because he wished to eliminate outside interests that could have a potential for conflict with Crestmont's interests.[33]  Corporate law imposes

(..continued)
loans on the Boonton project unless UJB released Seidman's guarantee motivated its approval of the release.  It shows that the release was good business for UJB, Seidman and Crestmont because it increased the pool of potential lenders in a tight market and gave Crestmont an opportunity to acquire good loans on their merits.

[33].  The situation would be entirely different if OTS had shown that Seidman had committed Crestmont to underwrite risky loans in exchange for his personal release, but there is no evidence that the Levine loan or any other end-user financing Crestmont considered was more risky than any other loan Crestmont might grant, nor is there evidence that Seidman promised to look favorably on any Boonton loan.  Until OTS decided loans could not be made on property developed with loans which a thrift director has guaranteed, Seidman was seeking only to withdraw from FSA as a partner against a promise of indemnity from the partner who was acquiring Seidman's interest.  This record shows Seidman was trying to meet OTS regulations rather than trying secretly to seek a release from his own potential liability at Crestmont's expense.

a duty of loyalty not because the conflict appears improper to a third party but to "'prevent[] a conflict of opposing interest in the minds of fiduciaries, whose duty it is to act solely for the benefit of their beneficiaries." FSLIC v. Molinaro, 889 F.2d 899, 904 (9th Cir. 1989) (quoting Restatement of Restitution § 197 comment c (1937)) (emphasis added). This record shows Seidman acted to avoid that conflict, not because of it.

We do not think every appearance of wrongdoing justifies the sanction of removal and prohibition. Rather, we believe such a drastic sanction should require some evidence of actual misconduct or evidence from which a reasonable person acquainted with the facts could conclude there was misconduct. Here, Crestmont never made any loan to an end-user on the FSA project, and Seidman told Bailey to stop considering any loans in which Seidman had an interest before OTS began its investigation. Seidman did so as soon as he realized he could not persuade OTS that his guarantee did not matter. Seidman's earlier attempts to persuade OTS to the contrary were not improper. Viewed as a whole, we think this record contains substantial evidence that Seidman acted to further the interests of Crestmont, not just his own, when he attempted to obtain a release from his guarantee, and therefore his actions did not constitute a breach of the fiduciary duty of loyalty contained in section 1818(e)(1)(A)(iii).

In summary, we hold Seidman's conduct in seeking a release from the UJB guarantee did not violate any "law or regulation" under section 1818(e)(1)(A)(i)(I) or constitute an

"unsafe or unsound" practice under section 1818(e)(1)(A)(ii) or a breach of fiduciary duty under section 1818(e)(1)(A)(iii). To the extent the Director relied on Seidman's conduct of seeking a release from his guarantee of FSA's indebtedness to UJB to support the order of removal and prohibition, the Director erred.

### B. Seidman's Failure to Remind Crestmont's Board or Senior Loan Committee of His Interest in FSA

Next, we consider whether the Director erred in concluding that Seidman's failure to remind Crestmont's Board or Senior Loan Committee of his interest in FSA constitutes an act under section 1818(e)(1)(A) that could support an order of removal and prohibition. The record shows Seidman had already made his interest in the Boonton project known through disclosure on the conflict forms he filed with Crestmont. The Director, however, thought Seidman had to bring his interest in FSA to the specific attention of Crestmont's Board or Senior Loan Committee before it began processing the proposed loan to Levine. Neither OTS nor the Director points to any general regulation or Crestmont policy that imposes any duty on Seidman more specific than his general duty to disclose his interest in FSA to Crestmont.[34] OTS does not cite any law or regulation requiring

---

[34]. A fiduciary's duty of candor is encompassed within the duty of loyalty. The duty of candor requires "corporate fiduciaries [to] 'disclose all material information relevant to corporate decisions from which they may derive a personal benefit.'" In re Bush, OTS AP 91-16 at 19, 1991 OTS DD LEXIS at 19 (quoting Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1280 (Del. 1989)).

Seidman to remind the Board or Senior Loan Committee of what he had already disclosed to them, nor does OTS argue Seidman's failure to repeat his disclosure constitutes an unsafe or unsound practice. Even if the Director were technically correct in finding that Seidman breached a fiduciary duty of candor when he failed specifically to remind the Senior Loan Committee of his interest in FSA each time the Levine loan came before the Committee, that breach would not be material because the record plainly shows that all three of the members of the Senior Loan Committee, Bailey, Seidman and arguably McClellan,[35] were fully aware of Seidman's interest in FSA.[36] Therefore, the Director erred when he decided Seidman breached his fiduciary duty of candor in not specifically reminding the Board or the Senior Loan

___

[35]. Before the ALJ, McClellan testified that as President of Crestmont he would review conflict of interest disclosure forms filed by relevant Crestmont personnel. It is further undisputed that Seidman had disclosed his FSA interest on the most recent two conflict of interest forms filed prior to the Levine loan. Thus, McClellan had imputed knowledge of Seidman's interest in FSA.

[36]. There is another reason why a renewed specific disclosure to the Senior Loan Committee was not material to Crestmont's decision to grant or deny the Levine loan. Crestmont's internal regulations do not require the Senior Loan Committee to review applications for loans of less than $500,000 unless they are for loans to "affiliated parties." The Levine application did not exceed $500,000, and the evidence on this record indicates that Crestmont would not have granted the loan if Seidman had not completed his withdrawal from FSA. Crestmont's President McClellan testified that it was the understanding in other similar situations that Seidman would withdraw his interest before Crestmont made any loans. See Bailey App. at 191. While Bailey should not have issued a commitment letter before Seidman completed his formal withdrawal from FSA, there is no evidence showing that Seidman anticipated Bailey's premature action.

Committee about his interest in FSA, and this second charge
cannot be grounds for a removal and prohibition order under
section 1818(e)(1)(A)(iii).


    C.   <u>Seidman's Attempt to Hinder the OTS Investigation</u>

Finally, we must consider whether Seidman's actions
during the pendency of the OTS investigation support removal and
prohibition.  The Director found Seidman lied in his deposition
of September 13, 1991, destroyed material evidence and encouraged
Risko to testify falsely about events surrounding the draft of
Risko's letter to UJB.  The Director stated:

> The OTS has a right to accurate and
> reliable information in the course of its
> examinations and investigations.  Seidman's
> lack of integrity, evidenced by his
> misleading testimony, his attempts to destroy
> evidence and his attempts to solicit false
> and misleading testimony, poses as a natural
> consequence an abnormal risk of loss or
> damage to the institution, the very essence
> of an unsafe or unsound practice.  The
> Director concludes that Seidman committed an
> unsafe and unsound practice by these attempts
> to obstruct the OTS investigation.
>
>    . . .
>
> Seidman benefitted from his efforts by
> depriving the OTS of reliable and material
> evidence, thwarting the OTS enforcement
> action and hampering the prompt resolution of
> the self-dealing charges.  Seidman
> demonstrated personal dishonesty by giving
> misleading testimony and omitting material
> facts during an OTS investigation and
> examination; destroying evidence; and
> soliciting another witness to give false
> testimony and destroy material evidence.

Seidman App. at 119-20.  While the Director did not directly relate his conclusions to the statutory requirements, it is clear he concluded that Seidman's conduct during the investigation constituted an unsafe or unsound practice under section 1818(e)(1)(A)(ii)[37] and that Seidman satisfied the effect component of section 1818(e)(1)(B)(iii) by receiving a personal benefit.

We agree with the Director that hindering an OTS investigation is an unsafe or unsound practice as that term has come to be used in the banking industry.  Section 1818(e)(1)(A) can be satisfied by evidence showing the conduct with which an affiliated person like Seidman is charged falls within section 1818(e)(1)(A)(ii)'s proscription of unsafe or unsound practices because it "is contrary to generally accepted standards of prudent operation" and "the possible consequences of [the act], if continued, would be abnormal risk or loss or damage to . . . the agenc[y] administering the insurance fund[]."  Gulf Federal Sav. & Loan Ass'n, 651 F.2d at 264 (quotation omitted); see also supra Part V.  We believe an attempt to obstruct an OTS investigation is such an act.  OTS is statutorily charged with preserving the financial integrity of the thrift system.  See 12 U.S.C.A. § 1462(a) (West Supp. 1994); id. § 1463(a).  To meet that responsibility, OTS has the power to investigate.  See 12 C.F.R. § 509.16 (1993).  Where a party attempts to induce another

---

[37].  The Director also concluded that Seidman's conduct violated a law or regulation under section 1818(e)(1)(A)(i)(I).  We do not question that conclusion.

to withhold material information from the agency, the agency becomes unable to fulfill its regulatory function. Such behavior, if continued, strikes at the heart of the regulatory function. Seidman's attempt to obstruct the investigation, if continued, would pose an abnormal risk of damage to OTS. Accordingly, we hold that an attempt to hinder an OTS investigation constitutes an "unsafe or unsound practice," thus satisfying the act requirement of section 1818(e)(1)(A).[38]

---

[38]. We believe that Seidman's act of soliciting false testimony was an attempt on Seidman's part to hinder the OTS investigation. We also believe his attempt to destroy material evidence could be viewed as hindering an OTS investigation, although, in this respect, the Director failed to state his reasons for disregarding the ALJ's credibility finding that Seidman acted without intent to hinder the investigation. See infra note 37. In addition, we note our disagreement with the Director's conclusion that Seidman gave deposition testimony that was "intentionally misleading as to material facts concerning Seidman's knowledge of the letter's contents and omitted material facts concerning the drafting of the letter." Seidman App. at 119 (footnote omitted). The transcript of Seidman's deposition reveals that the OTS investigator never directly questioned Seidman about the draft of the letter OTS charged him with concealing. Instead, the investigator asked only whether Risko and he had discussed OTS's investigation of the circumstances surrounding Seidman's release from the UJB guarantee. Seidman truthfully admitted that he had discussed the topic with Risko "two or three times." Seidman App. at 46. The investigator failed to ask Seidman about the initial draft of Risko's letter in support of the release, who had prepared the letter or what it meant, even though OTS not only knew about the early draft but had secretly obtained a copy of it.

Likewise, we do not think Seidman's failure to volunteer information about the draft of the Risko letter can, in and of itself, show an intent necessary to satisfy the culpable states of mind section 1818(e)(1)(C) requires. To satisfy section 1818(e)(1)(C) it must be shown that Seidman's act was either personally dishonest or in willful disregard of the safety of Crestmont. See 12 U.S.C.A. § 1818(e)(1)(C). OTS never directly asked Seidman the questions it now charges him with evading. A deponent's failure to volunteer information that the deponent

Our conclusion that Seidman's attempts to obstruct the OTS investigation constitute a prohibited act does not end our section 1818(e) inquiry. The act must still have a prohibited effect with a culpable intent before the severe sanction of a removal and prohibition order may issue. See Oberstar, 987 F.2d at 502. Section 1818(e)(1)(C)'s culpability element of personal dishonesty is shown by the undisputed evidence that Seidman asked Risko to forget about the draft of the letter to UJB.[39] The requirements of section 1818(e)(1)(B) remain.

(..continued)
might wish to conceal but is not directly asked about does not show an intent to deceive. Accordingly, we believe Seidman's deposition testimony is, by itself, insufficient to show either of the states of mind section 1818(e)(1)(C) requires. Cf. Bronston v. United States, 409 U.S. 352, 362 (1973) ("Precise questioning is imperative as a predicate for the offense of perjury. It may well be that petitioner's answers were not guileless but were instead shrewdly calculated to evade. Nevertheless, . . . any special problems arising from the literally true but unresponsive answer are to be remedied through the 'questioner's acuity' and not by a federal perjury prosecution.").

[39]. We note, however, that the Director's determination that Seidman intentionally destroyed the draft letter to thwart the investigation may not be adequately supported. The Director gives no reason for his decision to disregard the ALJ's finding that Seidman's testimony that he acted in anger and frustration without intent to destroy material evidence was credible. Seidman admits that he ripped up the initial draft of Risko's letter to UJB but says he acted in the heat of passion without an intent to conceal any improper conduct. The ALJ who heard Seidman made a specific finding that this testimony was credible. See Seidman App. at 49 ("The finding of fact is . . . while Seidman destroyed the documents intentionally, it was done in a fit of anger and not for the purpose of destroying material and relevant evidence."). The Director, without explanation, reversed this finding and concluded instead that Seidman's act of tearing up the draft was still another basis for the order of removal and prohibition.

The Director concluded that section 1818(e)(1)(B)'s requirement of an untoward or prohibited effect was satisfied because Seidman had benefitted from the release of his guarantee of FSA's loan to UJB.  We conclude, however, that none of Seidman's attempts to obstruct the OTS investigation resulted in any benefit to Seidman, the sole basis the Director relied on to satisfy section 1818(e)(1)(B)'s condition of an untoward or prohibited effect.  The Director made no other finding concerning any effect of Seidman's conduct that could satisfy section 1818(e)(1)(B) other than his conclusion that "Seidman benefitted from his [attempt to obstruct the OTS investigation] by depriving OTS of reliable and material evidence, thwarting OTS enforcement action and hampering the prompt resolution of the self-dealing charges."  Seidman App. at 120.  Section 1818(e)(1)(B)(iii) proscribes an act from which the actor "<u>has received</u> financial gain or other benefit by reason of such violation, practice, or breach . . . ."  12 U.S.C.A. § 1818(e)(1)(B)(iii) (emphasis added).

Seidman's attempt to solicit false testimony from Risko was rebuffed; therefore, Seidman received no benefit from his request that Risko forget about the draft letter.  Similarly,

(..continued)
The Director's finding, contrary to the finding of the ALJ, that Seidman acted with one of the culpable states of mind the statute specifies when he attempted to destroy evidence of the draft is not explained in the record now before us.  We recognize that the Director owes no deference to the findings of an ALJ, see supra, typescript at 28-29, but if he rejects an ALJ's finding on a witness's credibility we think it would be better practice for him to state his reasons for disregarding it.  See Citizens State Bank v. FDIC, 718 F.2d 1440, 1444 (9th Cir. 1983).

Seidman's destruction of a draft letter that OTS already possessed and his unwillingness to volunteer information in his deposition failed to thwart the OTS investigation.

Subsection (iii) requires a person who has committed an act that supports removal under section 1818(e)(1)(A) to have received an actual benefit from the act. In that respect, it is unmistakenly different from 12 U.S.C.A. § 1818(e)(1)(B)(ii), which uses the subjunctive "could be prejudiced" to describe a potential effect on the depositors as one of the untoward results that are a necessary condition of an order removing an affiliated person like Seidman from his office and banning him from banking forever. Section 1818(e)(1)(B)(iii)'s text is clear as to mode and tense, and we are bound by its text unless the result of following the text would be demonstrably at odds with Congress's intent. See, e.g., Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982); Dutton v. Wolpoff and Abamson, 5 F.3d 649, 654 (3d Cir. 1993). The statute does not permit removal and prohibition for acts which fail to confer a benefit on the actor. It requires a benefit that has been received. An unsuccessful attempt to secure a benefit is not one of the effects that can support removal and prohibition under section 1818(e)(1). Seidman has not received any actual benefit from his alleged attempts to obstruct the OTS investigation. Therefore, we hold that the Director erred in concluding that section 1818(e)(1)(B) had been satisfied.

It therefore follows that the Director's order removing Seidman from office and banning him for life from the banking

business was "unwarranted in law." See Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 185-86 (1973); Oberstar, 987 F.2d at 503. Accordingly, we will grant Seidman's petition for review and vacate the Director's order as it pertains to him. This is not to say, however, that we approve of Seidman's conduct during the course of the OTS investigation. We conclude only that OTS may not, on this record, impose the draconian sanction of removal and prohibition under section 1818(e) because all the conditions that statute imposes on that ultimate penalty have not been met. However, we believe, for the reasons discussed supra, that Seidman's attempts to obstruct the OTS investigation into his dealings with FSA and UJB, particularly his act of counseling Risko to withhold potentially material facts, do constitute an unsafe or unsound practice and so could support a cease and desist order and monetary penalties as authorized by section 1818(b)(1). While the notice of charges did not specifically request a cease and desist order with respect to Seidman's obstructionist conduct, it did ask for "[a]ny other relief deemed appropriate by the Director of OTS." Seidman App. at 20. Thus, we will remand so that the Director may consider whether a cease and desist order with accompanying civil penalties is appropriate in this instance.[40]

---

[40]. We believe the notice provisions of section 1818(b)(1) have been satisfied. Seidman was put on notice of the facts alleged to constitute an unsafe or unsound practice by the notice of charges issued pursuant to section 1818(e)(4). Compare 12 U.S.C.A. § 1818(b)(1) and 12 U.S.C.A. § 1818(e)(4).

## VII.  The Preliminary Suspension Order

Because we conclude we must vacate that part of the Director's order removing Seidman from his office at Crestmont and banning him from the banking industry, we find it unnecessary to address Seidman's argument that the district court erred in dismissing his action to enjoin enforcement of the OTS preliminary suspension.  Though we will remand for the Director to consider whether a cease and desist order should be entered against Seidman pursuant to 12 U.S.C.A. § 1818(b), that section of the governing statute, unlike section 1818(e), does not authorize entry of a preliminary suspension order.  See 12 U.S.C.A. § 1818(b) and (e).  We will therefore vacate the Director's order suspending Seidman from his office at Crestmont and from participating in Crestmont's business activities.

## VIII.  Summary

In sum, we will grant Seidman's petition for review of that part of the Director's order removing Seidman as a director of Crestmont and prohibiting him from participating in the banking industry and reverse that particular part of the order because the Director's conclusion that Seidman's attempts to obstruct OTS's investigation conferred a benefit upon him is not supported by substantial evidence on this record and is erroneous as a matter of law.  Nevertheless, because of the nature of Seidman's attempt to obstruct OTS and our conclusion that this attempt does constitute an unsafe or unsound practice, we will remand Seidman's case to the Director for him to consider whether

Seidman should on this record be subjected to the lesser sanction of a cease and desist order along with any monetary penalties that may be properly imposed. Because section 1818(b), unlike section 1818(e), does not authorize Seidman's removal from office and his prohibition from banking, we will also vacate the preliminary suspension order that the Director entered pursuant to section 1818(e)(3).[41]

## IX. Conclusion

For these reasons, we will grant Bailey's petition for review and reverse that part of the Director's order commanding him to cease and desist. We will also grant Seidman's petition for review of that portion of the Director's order removing him from his position as director and chairman of the board of Crestmont, reverse it and remand Seidman's case to the Director

---

[41]. Because we will vacate the Director's temporary suspension order, Seidman's challenge to the district court's order declining jurisdiction at our Docket No. 92-5392 is moot. This resolution also renders Seidman's and Bailey's challenge to the propriety of the remand to determine civil penalties moot. Seidman and Bailey both argued the Director's remand to the ALJ for further findings concerning the assessment of civil penalties unfairly gave OTS a second chance to make out its case. While this issue is now moot, we nevertheless note that the applicable regulations expressly authorize the Director to remand the "action or any aspect thereof" to the ALJ. 12 C.F.R. § 509.40(c)(2) (1993). In the cases now before us, the Director determined that the agency incorrectly assigned the burden of production on the assessment and mitigation of penalties to Seidman and Bailey. Exercising his regulatory authority to remand, the Director therefore sent the penalty issues back to the ALJ. Other courts have permitted similar remands when questions about the burden of production and proof were present. See, e.g., Dazzio v. FDIC, 970 F.2d 71, 75 (5th Cir. 1992); Merritt v. United States, 960 F.2d 15, 18 (2d Cir. 1992).

for further proceedings consistent with this opinion.  Finally, we will vacate that part of the Director's order temporarily suspending Seidman from his office at Crestmont and from participating in Crestmont's business activities.

IN THE MATTER OF SEIDMAN AND BAILEY

Nos. 92-3722 and 92-3729

SEIDMAN V. OFFICE OF THRIFT SUPERVISION

No. 92-5392

STAPLETON, J., Dissenting:

I agree that we have jurisdiction to review the cease and desist order against Bailey and the removal and prohibition order against Seidman. Unlike my colleagues, I would deny both petitions for review. As the Director noted at the beginning of his opinion, "[u]se of institutions by insiders for their own benefit has been one of the greatest threats to the safe and sound operation of savings associations and has exposed the Federal deposit insurance funds to significant risks." App. 94. Fortunately, the risk created by the conduct of Seidman and Bailey in this matter did not result in actual loss to their savings association or to the Federal deposit insurance funds. That fortuity, however, does not mandate that we overturn the orders before us.

The Director found that Seidman had engaged in undisclosed negotiations with UJB to secure release of a substantial personal obligation by representing to UJB Crestmont's willingness to make end-user loans to financially qualified purchasers of a UJB debtor and had later obstructed the OTS's investigation of the matter. The Director concluded that the self-dealing and the obstructive conduct provided independent bases for a removal and prohibition order. With respect to

Bailey, the Director concluded that he had engaged in an unsafe and unsound banking practice by causing a commitment to be made on a loan to a partnership in which Seidman had a financial interest without disclosing the transaction to the Board of Directors or the Senior Loan Committee.  I will examine each charge in turn.

I.

The ALJ and the Director found that Seidman had arranged with Poole & Co. to pursue a request by him that UJB release him from his $4.45 million personal guarantee.  They further found that Seidman drafted a letter for Risko to send on his behalf, along with a brief letter of his own asking for the release, pointing out that Seidman was the CEO of Crestmont, that Crestmont was entertaining requests for $1.7 million from prospective purchasers of property from Fulton Street Associates ("FSA"), a developer financed by UJB, and that Seidman's personal guarantee created a conflict of interest problem which would foreclose Crestmont from acting favorably on those requests. Seidman was also found to have approved an addition to his draft representing that "Crestmont would be willing to consider future financing [of such purchasers], assuming qualified buyers."  App. 41.  The letter was dispatched on May 31, 1991.

That the intended message was heard and understood is evidenced by the internal documents generated by UJB in response to Seidman's request.  The memo that went to UJB's Real Estate Asset Management Committee stated:

UJB has been approached by Lawrence B. Seidman, principal and guarantor of Fulton Street, requesting the release of his personal guaranty. Mr. Seidman is Chairman of the Board of Crestmont Federal Savings and Loan, the institution providing end loan takeouts of our warehouse loan. Mr. Seidman has conflict of interest in approving these takeouts while serving as UJB's guarantor and the project's principal. Crestmont is currently reviewing $1.7MM in end loan financing requests in an illiquid market. In order to reduce our exposure in the project, it becomes necessary to release Mr. Seidman. The only other alternative would be to provide the end loan financing ourselves at roughly twice the dollar UJB already has out to Borrowers . . . .

Although Mr. Seidman shows a net worth of $1.4MM, his liquidity is only $116M. In addition, he has recently contributed equity to the project, further depleting his liquidity. He does generate an income of $225M p.a. as CEO of Crestmont; however, he can be more valuable to the repayment of our loan as a source of end loan financing.

App. 42. UJB's Executive Vice President Eberhardt initialed this memorandum and added: "Agree. End loan financing has been critical to recent sales success."

Eberhardt testified that there was not a broad market for financing industrial condominium projects and that Crestmont was one of the few institutions willing to provide financing to potential purchasers of FSA's industrial condominiums at the Boonton site. The other members of the Committee agreed with Eberhardt's views and Seidman was notified on June 7, 1991, that UJB would release his guarantee.

Seidman did not advise Crestmont's Board of Directors or its President that he was seeking a release of his guarantee or that in pursuing a release he was trading on Crestmont's ability to provide end loan financing.

On June 1, 1991, an OTS examiner conducting an examination at Crestmont saw the first page of the draft letter sent in Risko's name to UJB. OTS immediately commenced a formal investigation and Seidman's deposition was taken. When questioned concerning the source of the arguments set forth in the letter favoring a grant of the release, Seidman gave the following testimony:

        Q.  Did you discuss with Mr. Risko what
    he would write?

        A.  I won't say we discussed it.  I saw
    the letter, but --

        Q.  Did you see the letter before he
    sent it to Mr. Eberhardt?

        A.  He thinks he sent it to me the day
    he sent it, and my secretary called him and
    told him I said it was okay, but I don't
    recall seeing it, but I may have.

        Q.  Okay.

        A.  I wasn't really -- I'm sorry,

        Q.  Did you discuss with him what
    position you would take with UJB to seek
    release from your personal guarantee?

        A.  No.

        Q.  How did he know?  Was it typical for
    him to write letters of this nature without
    discussing it with you?

A.   He knew the details backwards, forward and upside down.  He knew the deal much better than I did./  He was intimately involved in this transaction.  I was the outside guy.  I mean I was just the financial guy in this deal.  I knew almost nothing about this transaction.  He knew the tenants better than I did.  He stayed on it much better than I did.

* * *

Q.   Did you ask Mr. Risko -- I am sorry.  Let me show you OTS No. 7, which is a letter from James Risko to Robert Eberhardt, dated May 31, 1991 and ask you if you recall seeing that letter.

A.   Yes.  This is the letter that I referred to before that Mr. Risko thinks he sent me the day he sent it to Mr. Eberhardt.

Q.   Okay.  And that is the letter where you thought your secretary said you had read it and that you didn't have any problems with it?

A.   Right.

Q.   Do you recall reviewing that letter?

A.   No.

Q.   Okay.  Now, how did Mr. Risko come up with those reasons?  Did you ever discuss with him, first of all, the fact that, and why don't you give me the letter for a second.

Did you discuss with him the fact that your position as Chairman of Crestmont Federal Savings & Loan may make the financing of certain condo purchasers impossible if you were also a partner in Fulton Street?

A.   No.

Q.   Okay.  Did you discuss with Mr. Risko the fact that the inability to finance the end users, does not serve the United

Jersey Bank's position or that of the developer?

A. Mr. Risko and I had a discussion two or three times. We had that discussion, like I said before. Even Bob Eberhardt, who stated either Bob or George Rinneman or Stackhouse, that if there were any end users that they felt to be qualified, that they should send them to UJB, and most likely UJB would make a considerate effort to do those end loan financing.

So, I mean that was discussed at one of the meetings. I don't know if Mr. Risko was in that part of the conversation or not.

App. 44-46.

As I have noted, the ALJ and the Director found, with ample record support, that Seidman was the author of all but the concluding sentence of the Risko letter and that he had approved the addition of that sentence. While acknowledging that Seidman had not been asked direct questions in his deposition about the authorship of the letter, both the ALJ and the Director found the above quoted testimony to be "intentionally misleading" with respect to the source of the message conveyed in the Risko letter.

During the remainder of the investigation, Seidman was found to have (1) asked Risko and another principal of Poole & Co. to destroy relevant documents, (2) requested Risko to make false statements and avoid full disclosure and (3) personally destroyed material evidence in a fit of rage.

It is apparent to me from the text of the statute that Congress intended courts to defer the agency's determination of

what constitutes an "unsafe and unsound practice".[42]  As my colleagues acknowledge, Seidman's efforts to obstruct the investigation of the regulating agency undeniably constituted an "unsafe and unsound practice."[43]  Since I cannot say the Director was arbitrary or capricious in similarly characterizing Seidman's secret negotiations with UJB, I would sustain the conclusion of the Director that Seidman's conduct satisfied § 1818(e)(1)(A) in two different ways.

> The legislative history of the
>
> Act provides
>
> the following
>
> general insight
>
> into what
>
> Congress meant
>
> by an "unsafe
>
> and unsound"
>
> practice:

---

[42].  As the court noted in <u>Groos Nat'l Bank v. Comptroller of Currency</u>, 573 F.2d 889, 897 (5th Cir. 1978):

> [t]he phrase "unsafe or unsound banking practice" is widely used in the regulatory statutes and in case law, and one of the purposes of the banking acts is clearly to commit the progressive definition and eradication of such practices to the expertise of the appropriate regulatory agencies.

[43].  My colleagues do not acknowledge that Seidman's deposition testimony constituted "an unsafe and unsound practice" apparently because they do not find it materially misleading.  As I explain hereafter in applying § 1818(c)(1)(B), I disagree.

> [A]n "unsafe or unsound practice" embraces
> any action, or lack of action, which is
> contrary to generally accepted standards of
> prudent operation, the possible consequences
> of which, if continued, would be abnormal
> risk of loss or damage to an institution, its
> shareholders, or the agencies administering
> the insurance funds.

MCorp Fin., Inc. v. Bd. of Governors, 900 F.2d 852, 863 (5th Cir. 1990) (quoting from 112 Cong.Rec. 26474 (1966)), aff'd in part, rev'd in part on other grounds, Board of Governors v. MCorp Fin., Inc., 502 U.S. 32 (1991).  I do not disagree with my colleagues that the required "abnormal risk of loss or damages" refers to something more serious than the consequences of a breach of contract in the regular course of the bank's business.  On the other hand, it seems clear from the above-quoted legislative history that the relevant "risk" is not that occasioned by the specific conduct engaged in in this particular case, but rather the risk that would be occasioned if similar conduct were "continued" as a way of doing business.

The record reflects that the market for end-user loans for industrial condominiums was thin.  It further reflects that Boonton project had experienced financial difficulties, that few commercial lenders were willing to undertake end user financing for that project, and the UJB, Boonton's principal debt financer, was concerned about getting its money back.  Crestmont had loan applications for a substantial amount of end user financing from prospective purchasers of Boonton properties.  It had not previously engaged in such financing and it was faced with a

decision on whether it was in the bank's best interest to extend credit under these circumstances. Seidman's was a very influential voice in Crestmont's decision making process on such matters.

It was against this background that Seidman approached UJB seeking release of his guarantee without informing his fellow officers and directors. To secure that release, he drafted, approved, and caused to be dispatched, the Risko letter. It was clearly not unreasonable for the ALJ and the Board to understand this as a successful effort by Seidman to use the bank's ability to provide Boonton financing in order to secure a personal benefit. To be sure, Seidman testified that his letter was motivated by his desire to put Crestmont in a position to make loans he thought were desirable from its point of view and neither the ALJ nor the Director made a finding that this subjective motivation did not exist. It thus may be that Crestmont, as well as Seidman, under other circumstances might have benefitted from the release of Seidman's guarantee. But Seidman's reliance on his motivation ignores the fact that he failed to disclose his release and the representation he made as to Crestmont's willingness to provide end user financing to purchasers of Boonton property who were financially qualified.

While it is true that Seidman made no legally binding commitment on behalf of Crestmont in the course of seeking the release of his $4.5 million guarantee, it was not arbitrary and capricious for the Director to recognize that communications like Seidman's Risko letter and responsive actions like those of UJB

would have a significant potential for affecting decision making at the bank, a potential that was greatly increased by Seidman's failure to disclose his activities. It is not unrealistic, it seems to me, to believe that the judgment of someone in Seidman's position on whether to undertake Boonton end-user financing would be influenced, if not altogether controlled, by his release. Nor, I believe, is it unrealistic, given Seidman's failure either to reveal the release transaction to his co-fiduciaries or to disqualify himself from participating in discussions of Boonton's financing, for the Director to perceive an abnormal risk that the bank's decision making process regarding that financing would be substantially skewed.

In short, I do not think the Director acted arbitrarily or capriciously in concluding that a continuing practice of undisclosed trading on the chief executive's corporate influence for personal benefit would hold an abnormal risk of loss or damage to the bank.

Turning to Section 1818(e)(1)(B), I would sustain the Director's conclusions once again. While Seidman contends otherwise, the Director was clearly justified in concluding that Seidman benefitted from the release of his $4.5 million guarantee. I believe he was also entitled to find that Seidman benefitted from his obstructive tactics during the investigation. While I agree that, fortuitously, Seidman did not benefit from his efforts to suborn perjury and destroy evidence, this leaves his materially misleading deposition testimony. In the words of the Director, "Seidman benefitted from his efforts by depriving

the OTS of reliable and material evidence, thwarting the OTS enforcement action and hampering the prompt resolution of the self-dealing charges."  App. 120.

I do not agree with my colleagues' apparent position that misleading testimony before an investigating regulatory agency cannot constitute an "unsafe and unsound practice" unless it is perjurious.  Accordingly, I have no difficulty with the failure of the examiners to ask more specific questions.   Nor can I agree with my colleagues that Seidman's testimony was not materially misleading.  As I read the transcript, Seidman did not acknowledge that he was the source of the strategy reflected in the Risko letter and, indeed, purposefully led the examiner to believe he was not.  At the time of the deposition, the agency did not know that Seidman was the author of that strategy and that fact was clearly material to an investigation into whether Seidman had secretly traded on his influence at the bank to secure a release of his personal guarantee.

Finally, I turn to § 1818(e)(1)(C).  Based on my reading of the Seidman deposition, the ALJ and the Director were justified in concluding that Seidman's conduct involved "personal dishonesty" within the meaning of subsection (i).  I also believe they were justified in finding that Seidman's undisclosed negotiations with UJB demonstrated a "willful . . . disregard for the safety and soundness" of the bank within the meaning of subsection (ii).

"Willful" is a word that has different meaning in different contexts, and the courts have not yet defined it in the

context of subsection (ii).  Whatever the precise definition may turn out to be, however, I am satisfied that the "willful disregard" requirement of subsection (ii) is met in this case. The undisclosed negotiations with UJB found by the Director to be an unsafe and unsound practice were intentional and deliberate. That Seidman has a subjective appreciation of the wrongfulness of his conduct and of the risk conduct of that kind poses for a bank can reasonably be inferred from the fact that he tried to cover up his conduct when the investigation commenced.


## II.

Mr. Bailey's case is a more sympathetic one, but it seems relatively clear to me that the Director did not abuse his discretion in issuing a cease and desist order directing that Bailey's conduct with respect to the Levine loan application not be repeated.

Steven Levine applied to Crestmont in December of 1990 for end-user financing for the purchase of a commercial condominium at the Boonton project.  The Boonton Project was owned by FSA, a partnership in which Bailey knew Seidman was a general partner.

A mortgage commitment on the Levine application was issued by Crestmont on March 19, 1991, and modified on April 12, 1991.  For some reason, Levine and FSA did not consummate the purchase at that time, and the commitment was not timely accepted.  Negotiations continued, however, and a contract for the purchase, for the price of $466,680, was entered into on May

10, 1991.  A superseding commitment letter was issued by Crestmont on May 19, 1991, through Bailey, committing to a loan of $375,000.  The purchaser accepted the commitment letter after its expiration date, with delivery of a deposit check for $2,000, which was deposited by Crestmont.

Under Crestmont's internal operating rules, any loan transaction in which an officer or director of Crestmont had an interest had to be submitted to the Senior Loan Committee for approval.  Bailey, Seidman, and Crestmont's then president, Mr. McClellan constituted the Senior Loan Committee.  The bank's commitments to the Levine financing were made without the approval of the Senior Loan Committee.  Neither Mr. McClellan nor anyone else on Crestmont's Board of Directors were informed before these commitments were made that Levine wished financing for a purchase of property from a partnership in which Seidman had a financial interest.[44]

Bailey asked Seidman and his partners on three occasions about the fact that Seidman had an interest in the transaction Levine wished to finance.  On each occasion, he was advised that Seidman was "getting out" of FSA and it was Bailey's understanding that Levine wouldn't actually be given any money

---

[44].  It is true, as my colleagues stress, that Seidman had disclosed his interest in FSA on the conflict of interest forms he had filed with the bank prior to the approval of the Levine financing and that McClellan testified he reviewed those forms from time to time.  But the ALJ and the Director concluded, with record support, that because of Bailey's failure to submit the Levine application to the Senior Loan Committee, McClellan was not exposed to any communication alerting him to the fact that Levine's application related to a purchase from FSA.

unless and until Seidman was "out." As I have noted, Seidman did not get all the way "out" until UJB released his $4.45 million guarantee at some point after June 7, 1991. Indeed, when the commitments were made, Seidman and his partners were attempting to renegotiate FSA's financing with UJB and Seidman's participation was understood by all to be necessary to reaching an agreement with UJB on a reorganization. Agreement was reached on May 20, 1991, and it was on that day that Seidman signed his guarantee. Thus, at the time of each of the three bank commitments made to Levine with Bailey's approval, Seidman had an interest in the transaction Levine intended to finance.

Bailey's understanding that Levine would get no money until Seidman was "out" of FSA does not mean the Director erred in finding an "unsafe and unsound practice" and issuing a cease and desist order. Conflicts of interest are important because of the potential they hold for undermining an institution's decision making process. Here Seidman and Bailey made the decisions to commit the bank to Levine when Seidman had a conflicting interest and when Seidman's and Bailey's judgments were susceptible to being influenced by that conflicting interest. That is the crucial fact that makes Bailey's conduct an "unsafe and unsound practice" in the Director's eyes. Seidman and Bailey obviously had no plans to submit Levine's loan application to the Senior Loan Committee or anyone else before the financing was issued. For better or for worse, if events had transpired as Seidman and Bailey anticipated in the Spring of 1991 they would, the bank would have made a substantial loan based on the judgment of

Seidman and Bailey exercised when Seidman's personal fortunes were very much still tied to those of FSA.

Crestmont's loan policy prohibited loans being approved in the manner Seidman and Bailey approved the Levine financing precisely because a <u>continuing practice</u> of approving loans in that manner would pose an abnormal risk to the financial stability of the bank.  I am unwilling to fault the Director for reaching the same conclusion Crestmont's management did when it established its rules.

III.

I would deny the petitions of Seidman and Bailey for review.