Michael **COUSIN**, Petitioner,

v.

**OFFICE OF THRIFT SUPERVISION,**
**Department of Treasury,**
**Respondent.**

Nos. 1680, 297, Dockets 94–4206, 94–6070.

United States Court of Appeals,
Second Circuit.

Argued June 23, 1995.

Decided Jan. 3, 1996.

---

RAMSEY CLARK, New York City (Lawrence Schilling, New York City, on the brief), for petitioner.

GERALDINE R. GENNET, Office of the Chief Counsel, Office of Thrift Supervision, Washington, DC (Carolyn B. Lieberman, Thomas J. Segal, Elizabeth R. Moore, Dirk S. Roberts, Office of the Chief Counsel, Office of Thrift Supervision, Washington, DC, on the brief), for respondent.

Before: KEARSE, ALTIMARI and PARKER, Circuit Judges.

ALTIMARI, Circuit Judge:

Petitioner Michael Cousin ("Cousin") seeks review of a Final Decision and Order of the Acting Director ("AD"), Jonathan L. Fiechter, of the Office of Thrift Supervision ("OTS"), Department of the Treasury, prohibiting Cousin from further participating in any manner, in the conduct of the affairs of any banking institution regulated by the Office of Thrift Supervision. Cousin's permanent prohibition made final a temporary suspension and prohibition which had previously been issued by the OTS, the issuance of which Cousin had appealed before this Court. Cousin now argues that 1) the procedure by which the OTS issued a permanent prohibition against Cousin violated his due process rights under the Fifth Amendment to the United States Constitution; 2) the Final Decision and Order was not supported by substantial evidence on the record; and 3) the AD improperly denied Cousin's defense of entrapment and outrageous government misconduct. Because we find Cousin's arguments to lack merit, we deny his petition for review of the OTS's Final Decision and Order. We further dismiss Cousin's appeal concerning the temporary suspension and prohibition as moot.

## BACKGROUND

### A. Procedural History

On August 8, 1990, Cousin, then-chairman of the Board and chief executive officer of Cross County Federal Savings Bank ("County Federal" or "Bank"), was charged in federal court with several counts of bribery. The OTS was informed of the charges and, two days later, issued a temporary suspension and prohibition from participation in the affairs of County Federal. After an administrative hearing on March 1, 1991, the temporary suspension and prohibition was continued until final disposition of the criminal charges pending against Cousin.

Cousin then sought to have the criminal indictment against him dropped in federal court, asserting that he was neither physically nor mentally fit to stand trial. The district court agreed to dismiss the indictment against Cousin because he was not physically capable of standing trial; however, included in the order dismissing the charges against Cousin, dated May 25, 1992, was language—agreed to by Cousin's attorney—to the effect that the dismissal of the indictment did not amount to a dismissal on the merits. *See Cousin v. Office of Thrift Supervision,* 840 F.Supp. 8, 9–10 (E.D.N.Y.1993). The language was specifically included in the order to ensure that the dismissal was not construed as requiring the discontinuation of the OTS's temporary suspension and prohibition against Cousin. *Id.* at 11.

Upon dismissal of the indictment for health reasons, Cousin underwent a remarkable recovery and informed the OTS that he was sufficiently physically and mentally fit to reenter the banking world. Despite the explicit language in the order dismissing his indictment, Cousin thereafter sought a declaratory judgment in the district court stating that his indictment had been dismissed on its merits and that, as a matter of law, the OTS temporary suspension was required to be lifted. *Id.* at 8. In light of the language in the order dismissing his indictment—language which Cousin himself had agreed upon—the district court dismissed Cousin's suit on waiver grounds. *Id.* at 11. Cousin then appealed the district court's dismissal of his action.

On May 13, 1993, the OTS instituted a proceeding to permanently prohibit Cousin from further participating in any manner, in the conduct of the affairs of any banking institution regulated by the OTS. In support of the permanent prohibition, Cousin was charged with bribery and aiding and abetting bribery. He responded to the OTS claims and asserted a number of affirmative defenses, focusing primarily upon entrapment. A hearing of the claims was held before Administrative Law Judge ("ALJ") Walter J. Alprin between September 13 and 15, 1993. On March 31, 1994, the ALJ issued his recommended decision and order, disqualifying Cousin from further participation in any federally insured banking institution. By Order dated October 11, 1994, the AD accepted some of the ALJ's findings, rejected others, and issued a permanent prohibition against Cousin's further participation in the banking industry.

Cousin now petitions for review of the Final Decision and Order of the AD. Because Cousin's previous appeal is necessarily resolved by this petition for review of the superseding Final Decision and Order, that appeal was referred to this panel by order of the Court on December 30, 1994, and is resolved below.

### B. The ALJ's Recommended Decision and Order

#### 1. Findings of Fact

In his March 31, 1994, recommended ruling, ALJ Alprin made the following specific factual findings.

While investigating criminal activities unrelated to Cousin, IRS Special Agent Kevin McLaughlin ("McLaughlin") subpoenaed Cousin's bank records in late 1986. In response to the subpoena, Cousin contacted McLaughlin and suggested that he was willing to meet with him and voluntarily produce everything subpoenaed by the government. At a meeting with McLaughlin on May 27, 1987, Cousin offered to make a monetary contribution to the charity of McLaughlin's choice. McLaughlin took Cousin's offer to be an attempt at bribery. After discussing this

conversation with his superiors at the IRS, McLaughlin was directed to engage in an undercover operation to determine if Cousin would follow through with his offered bribe. Cousin did, in fact, follow through with his promise; on June 9, 1987, in his office at County Federal, Cousin gave McLaughlin $1,750 in cash and a silver bar.

In an effort to determine if Cousin would engage in further bribery, the IRS served a grand jury subpoena on All Queens Tudor Realty, Inc., an organization in which Cousin had a financial interest. Cousin again met with McLaughlin in his office at the bank, on February 10, 1988, and offered to pay him if he would quash the subpoena. On February 18, 1988, Cousin invited McLaughlin to his office, where he gave the IRS agent $6,500.

A short time later, Cousin conceived of a scheme in which McLaughlin could receive additional bribes. According to McLaughlin's testimony, Cousin suggested that he "could give me some information on some individuals, that I could open up a case, and then he could arrange for them to pay me money to kill that case that I had opened up." In furtherance of his plan, Cousin arranged for an associate of his, Max Fodera ("Fodera"), to act as an intermediary in the bribery scheme. On May 11, 1988, Cousin acquired the bank files of Joan and John Parlante, who he believed to be engaged in tax evasion. Cousin informed McLaughlin of his hunch, which he based upon the fact that the Parlantes made their mortgage payments in cash and under-reported their income. To assist McLaughlin in acquiring a subpoena of the Parlantes' files, Cousin provided him with the Parlantes' social security numbers, business names, location of houses and businesses, and salaries. At the time that Cousin revealed this confidential bank information, he had no authority to do so, nor did County Federal inform the Parlantes that the information had been revealed.

On August 15, 1988, a subpoena was served upon Cousin for the Parlantes' bank files and the Parlantes were notified of the pending tax investigation. Mrs. Parlante instructed Cousin to provide any and all information the IRS requested. Cousin, however, informed Mrs. Parlante that he knew she could bribe McLaughlin into dropping the investigation. Mrs. Parlante resisted the idea. A short time later, however—after a second grand jury subpoena had been served upon the Parlantes requesting information about their business—Mr. Parlante met with Cousin to discuss the possibility of arranging a bribe. Cousin instructed Mr. Parlante on how to bribe McLaughlin, using Fodera as an intermediary, which Mr. Parlante did on October 20, 1988, paying McLaughlin $25,000 to have the IRS investigation ended.

### 2. *Applicable Law*

Under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), P.L. No. 101–73, 103 Stat. 183 (1989), the OTS has the authority to apply the remedies established under FIRREA to actions taken prior to 1989. *See In re Keating,* OTS Order No. AP 91–20 at 17–23 (May 11, 1991), 1991 WL 540752, *9, *13 n. 8 (O.T.S.). In doing so, the OTS must apply the standard for liability established at the time of the conduct. *Id.* Because the conduct in the case at hand occurred in 1987 and 1988, it is necessary to apply pre-FIRREA law. Specifically, pursuant to 12 U.S.C. § 1464(d)(4)(A) (1982) (for current provision, *see,* 12 U.S.C. § 1818(e) (1994)), the OTS may bar an officer from future participation in the affairs of a federally insured banking institution if it finds that the officer has:

committed any violation of law, rule, or regulation ..., **or**

has engaged or participated in any unsafe or unsound practice in connection with the association, **or**

has committed or engaged in any act, omission, or practice which constitutes a breach of his fiduciary duty as such director or officer,

**and**

the Board determines that the association has suffered or will probably suffer substantial financial loss or other damage[,] **or**

that the interests of its savings account holders could be seriously prejudiced by

reason of such violation or practice or breach of fiduciary duty, **or**

that the director or officer has received financial gain by reason of such violation or practice or breach of fiduciary duty, **and**

■ *that such violation or practice or breach of fiduciary duty is one involving personal dishonesty on the part of such director or officer,*

**or**

a willful or continuing disregard for the safety or soundness of the association.

12 U.S.C. § 1464(d)(4)(A) (1982) (emphasis and format added). These three sub-sections of § 1464(d)(4) have come to be known as the (1) "misconduct," (2) "effect," and (3) "culpability" prongs of the prohibition test. *See Oberstar v. Federal Deposit Insurance Corporation,* 987 F.2d 494, 500 (8th Cir.1993) (construing 12 U.S.C. § 1818(e)).

In the administrative hearing against Cousin, the application of § 1464(d)(4) focused upon two counts of wrongdoing: Count I concerned Cousin's bribery of McLaughlin in 1987 and 1988 and Count II addressed Cousin's disclosure of confidential bank information as part of his aiding and abetting in the bribery of McLaughlin in 1988.

### 3. *Count I: Bribery*

As to Count I, the ALJ found that Part (1) was met by Cousin's bribery, which was a violation of the law. While Cousin argued that the OTS must show a breach of law related to the banking industry, the ALJ determined that the breach of any law was sufficient so long as it had "a specific nexus to direct repercussions in banking depository institutions." The ALJ determined that the 1987 bribery charge was not supported by a preponderance of the evidence, but that the 1988 bribery charge was. In his defense, Cousin asserted that the 1988 bribe was a result of entrapment. The ALJ rejected Cousin's claim, pointing out that the government was responsible for initiating virtually none of the contacts with Cousin leading up to the bribe. Thus, the ALJ determined that because Cousin had "violated a law," the misconduct prong was met.

Despite finding that Cousin's Count I constituted a violation of the law meeting the requirements of Part (1), the ALJ determined that the OTS could not establish the requisite "effects" of Part (2). Under the financial loss provision of the effects prong, the OTS was required to demonstrate that, as a result of Cousin's criminal act, his financial institution "has suffered or will probably suffer *substantial* financial loss." (emphasis added). While the ALJ found that the institution might suffer some loss, it did not find the potential for *substantial* loss as required by the pre-FIRREA law (§ 1818(e)(1)(B)(i)—FIRREA's effects prong—requires only that the institution will probably suffer "loss" not "substantial loss"). Therefore, the ALJ held that the effects prong was not met and Count I was insufficient to justify permanently barring Cousin from conducting the affairs of any federally insured banking institution.

Finally, as to Part (3), the ALJ determined that in order to sustain a permanent prohibition, Cousin must have acted in a manner that "evidence[d] willful or continuing disregard for the safety or soundness of [County Federal] itself." While the ALJ found Cousin to have demonstrated personal dishonesty, he found the particular dishonesty in Count I did not impact upon the banking institution or upon Cousin's dealings with the institution. Thus, the OTS failed to meet the culpability prong with respect to Count I as well.

### 4. *Count II: Aiding and Abetting Bribery*

As to Count II, the ALJ determined that Cousin's actions violated all three subparts of the misconduct prong; the revelation of confidential bank information for the sake of aiding and abetting bribery 1) was a violation of law with a nexus to the banking institution, 2) was an unsafe and unsound practice, and 3) was a breach of fiduciary duty. The ALJ found that the OTS had shown by a preponderance of the evidence that Cousin had aided and abetted in the Parlantes' act of bribery. Looking to the record of the House hearing on the Financial Institution Supervisory Act of 1966, the ALJ concluded that Cousin had committed an unsafe and un-

sound practice when he misused his position in the Bank by revealing confidential information which he obtained through his position of authority. *See also* Right to Financial Privacy Act, 12 U.S.C. §§ 3401 *et. seq.* (1988) (conditions for providing government officials with customer's financial records). Furthermore, the same revelation of confidential information amounted to a breach of Cousin's fiduciary duty to the Parlantes, County Federal customers.

As to Part (2), the ALJ determined that "the disclosure and misuse of confidential bank information is integrally related to [Cousin] and his position at [County Federal]." In light of the testimony presented at the hearing, the ALJ concluded that the revelation of confidential information was a sufficiently gross breach of Cousin's responsibilities as Bank president that an exodus of customers might result; such an exodus would amount to *substantial* harm, meeting the mandates of Part (2).

Finally, the ALJ found that Cousin met the culpability prong when he not only acted dishonestly, but when his dishonesty demonstrated a "willful and continuing disregard for the safety and soundness of [County Federal]." Accordingly, all of the requirements for pre-FIRREA removal under 12 U.S.C. § 1464(d)(4) were met by Cousin's actions. The ALJ recommended Cousin's removal and prohibition from further participation in the affairs of any federally insured financial institution.

## C. The AD's Decision and Order

Despite reaching the same conclusion as the ALJ—namely, that Cousin should be permanently barred from participating in the affairs of any federally insured institution—the AD disagreed with the ALJ on a number of counts. The AD accepted the ALJ's finding of facts, as recited above, in their entirety. However, when pertinent to his evaluation of the law, the AD made additional factual determinations.

### 1. Count I: Bribery

Despite the ALJ's determination that there was insufficient evidence to support a finding that Cousin's activities in 1987 amounted to bribery, the AD held that there was clear evidence on the record, albeit circumstantial, to support such a finding. The AD determined that there was sufficient evidence to show by a preponderance of the evidence that Cousin, 1) corruptly, 2) gave $1,750 and a silver bar, 3) to McLaughlin, a government official, 4) in order to induce him into quashing the subpoena. *See* 18 U.S.C. § 201(b)(1)(C) (1988) (elements of bribery); *United States v. Gallo,* 863 F.2d 185, 189 (2d Cir.1988) (same), *cert. denied,* 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989). The AD drew further support for his determination from the fact that Cousin presented no witnesses on his behalf and did not testify in order to rebut the bribery charge. *See Office of Thrift Supervision v. Lopez,* 960 F.2d 958, 965 (11th Cir.1992) (adverse inference may be drawn from failure to testify on own behalf). In addition, the AD found that there was sufficient evidence to demonstrate that Cousin had illegally offered a federal official a gratuity. *See* 18 U.S.C. § 201(c)(1)(A) (elements of illicit gratuity). As to these offenses, the AD rejected Cousin's entrapment defense and his assertion that the OTS was limited to punishing violations of banking law.

With respect to the effects prong, the AD rejected the ALJ's conclusion that there was insufficient evidence of potential substantial harm to the bank's depositors from Cousin's wrongdoing. The AD held that the harm to the bank need only be *potentially* substantial, *see In re Anonymous,* FDIC Docket No. FDIC–84–86g (July 30, 1984); that substantiality requirement was met, according to the AD, by 1) the serious risk of harm to County Federal's reputation from its director's actions, and 2) the inevitable damage to the credibility of the bank official (Cousin) with the OTS and the resultant interference with the regulatory process that could potentially arise. Accordingly, the AD found that Cousin's actions satisfied Part (2) of the test.

Finally, in keeping with his finding as to the intentional illegality of Cousin's actions charged in Count I, the AD determined that those actions demonstrated "personal dishonesty" on the part of Cousin. Moreover, the AD rejected the ALJ's conclusion that the

personal dishonesty charged need necessarily relate to banking activity; rather, the AD held that the OTS need only demonstrate that the individual charged has engaged in some activity which displays dishonesty. Thus, the AD concluded that Count I was sufficient to justify Cousin's prohibition and removal from engaging in banking activity.

### 2. *Count II: Aiding and Abetting Bribery*

As to Count II, the AD concluded:

The Acting Director affirms the ALJ's conclusions concerning Respondent's liability under Count II. Because, however, the ALJ's analysis regarding the second and third elements of the removal/prohibition analysis imposes standards not required by the statute, the Acting Director does not adopt his analysis.

Despite rejecting the ALJ's analysis, the AD accepted the ALJ's conclusion that Cousin's actions amounted to aiding and abetting the bribery of a federal official in violation of federal law. *See* 18 U.S.C. §§ 2(a) (aiding and abetting) and 201(b)(1)(C) (bribery); *United States v. Menesses,* 962 F.2d 420, 427 (5th Cir.1992); *United States v. Shulman,* 624 F.2d 384, 387–88 (2d Cir.1980). With respect to Part (2), the AD determined that Cousin had put depositors in danger of "serious prejudice" and, therefore, it was unnecessary to consider the ALJ's determination that the bank faced potential substantial harm as a result of Cousin's actions. Because the misconduct at issue in Count II involved the "use of confidential customer information to orchestrate and assist the commission of criminal activity," the AD determined that it was even more detrimental to the interests of the depositors than was the activity alleged in Count I. The AD concluded that "[d]epositors are entitled to trust the management of depository institutions to spend their time ... furthering the interests of the association, not committing illegal acts.... [B]y virtue of [Cousin's] misconduct, the interests of Cross County depositors could be seriously prejudiced."

With respect to Part (3), as discussed above, the AD determined that Cousin had demonstrated personal dishonesty. In addition, the AD found that Cousin orchestrated a bribery scheme over several months and that such behavior constituted "willful [and] continuing disregard for the safety [and] soundness of [the Bank]." *See* 12 U.S.C. § 1464(d)(4)(A) (1982). Accordingly, Count II met all the requirements for prohibition and the AD ordered that Cousin be removed from his office at County Federal, and be prohibited from further participation in any manner, in the conduct of the affairs of any institution regulated by the OTS.

### D. *The Appeal*

Cousin now petitions for review of the AD's decision. Specifically, Cousin asserts that 1) the AD's exercise of his "absolute discretion" violated Cousin's right to due process, 2) the AD's decision was not supported by substantial evidence, and 3) the AD and ALJ improperly excluded important evidence on entrapment and outrageous government conduct.

## DISCUSSION

In reviewing final orders of the OTS, the factual determinations of the AD must be accepted if supported by substantial evidence on the record. *See Seidman v. Office of Thrift Supervision,* 37 F.3d 911, 924 (3d Cir.1994). We review the AD's legal interpretations *de novo. See 1185 Ave. of Americas Assocs. v. Resolution Trust Corp.,* 22 F.3d 494, 497 (2d Cir.1994) (deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), inappropriate when statute administered by several agencies); *Wachtel v. Office of Thrift Supervision,* 982 F.2d 581, 585 (D.C.Cir. 1993) (same).

### 1. *Due Process*

Cousin asserts that the process by which he was permanently barred from running a federally regulated bank violated his Fifth Amendment right to due process. According to Cousin,

[i]n the most extreme delegation of discretion yet, arising from the savings and loan scandal which cost Americans many tens of

billions of dollars, Congress placed arbitrary power in the form of near absolute discretion in the Director of OTS. How well such absolute power served the public and the S & L industry is indicated by the tragedy which befell both on the OTS's watch.

Specifically, Cousin argues that his due process rights were violated by the mixing of investigatory, prosecutorial, and adjudicative functions by the OTS. According to Cousin, the AD acted with impermissible bias when he "arbitrarily reversed the ALJ on virtually every finding and ruling [the ALJ] made." Moreover, Cousin suggests that it is clear from the face of the AD's Final Order that the OTS had a "vendetta" against him that dictated the outcome of the hearing.

■ The administrative process by which Cousin was disciplined was mandated by statute and entirely constitutional. While the AD had authority over the investigative, prosecutorial and adjudicative functions performed by his agency, and while he also had absolute discretion to accept or reject the ALJ's recommended findings of fact and rulings of law when arriving at his Final Order, such combined functions and adjudicatory discretion fall well within the mandates of the Fifth Amendment. *See Withrow v. Larkin,* 421 U.S. 35, 57–58, 95 S.Ct. 1456, 1469–70, 43 L.Ed.2d 712 (1975) (risk of prejudice from joint functions of administrative agency does not rise to level of due process violation). *See also Keating v. Office of Thrift Supervision,* 45 F.3d 322, 327–28 (9th Cir.) (OTS procedure permissible), *cert. denied,* —— U.S. ——, 116 S.Ct. 94, 133 L.Ed.2d 49 (1995); *Seidman,* 37 F.3d at 924–26 (same).

Cousin asserts that the AD's exercise of his discretion demonstrated bias and was therefore a violation of his due process rights. *See, e.g., Seidman,* 37 F.3d at 924. In support of this contention, Cousin points to the numerous adverse findings made by the AD, particularly those rejecting the recommended ruling of the ALJ. Despite Cousin's protestations, except his general insistence that the AD's Final Order demonstrates bias on its face, Cousin cannot point to a single factor indicating the AD's bias against him. As is clear from our discussion

of the substance of the Final Order below, there is no merit to Cousin's claim that the AD's findings of fact and conclusions of law demonstrate bias. The process by which Cousin was barred from future participation in any federally insured banking institution was statutorily mandated and entirely constitutional. *See, generally, Seidman,* 37 F.3d at 924–26.

### 2. *Substantiality of Evidence*

Cousin asserts that the AD's Final Order is not supported by substantial evidence on the record. The lack of factual support for the AD's prohibition order, according to Cousin, is particularly clear from the AD's arbitrary rejection of the ALJ's factual determinations and conclusions of law. Cousin contends that neither Count I nor Count II of the AD's Final Order is sufficient to justify his prohibition from the banking industry. Because we find that the AD's Order was amply supported by Cousin's illegal actions under Count II, we need not address Count I.

### A. *Misconduct*

The AD determined that, as to Count II, Cousin violated all three subparts of the misconduct prong—Cousin violated a law, engaged in an unsafe or unsound banking practice, and breached his fiduciary duties as a director of the Bank. *See* 12 U.S.C. § 1464(d)(4)(A) (1982). Specifically, the AD ruled that there was sufficient evidence to prove that Cousin had aided and abetted in the bribery of a government official; that such aiding and abetting, which involved the revelation of confidential bank information, constituted a breach of his fiduciary duty as bank president; and, that Cousin's criminal activity, which implicated another bank employee and bank customers, amounted to an unsafe or unsound banking practice.

Cousin contends that the OTS does not have the authority to punish him for an alleged crime, when the indictment for that crime had been voluntarily dismissed by the government. Not only does Cousin argue that there is insufficient evidence to support a determination that he aided and abetted in the bribery of a government official (as is

demonstrated by the dismissal of the indictment), Cousin asserts that even if he did commit such a crime, § 1464(d)(4) does not allow a prohibition order to be founded upon non-banking related violations of the law. The AD erred as a matter of law, according to Cousin, when he rejected the ALJ's proper determination that such predicate violations of the law need at least have some nexus to the banking industry.

 Upon a review of the record, we find that there was ample evidence to support the conclusion arrived at by both the AD and ALJ, that Cousin aided and abetted in an illegal bribe. The testimony of Agent McLaughlin, Mr. Parlante, and Max Fodera makes clear that Cousin conceived of a scheme in which he assisted a government official in the investigation of the potential financial improprieties of County Federal bank customers so that he might ultimately orchestrate the bribery of that government official. As the AD concluded, while "it is unclear precisely what motivated [Cousin] to perpetrate his illegal scheme, it is clear that.... [Cousin's] purpose in providing confidential customer information to McLaughlin was to facilitate a bribery scheme." Because the AD's conclusion was fully supported by the record, we find that the misconduct prong has been met.

It is disingenuous and contemptible for Cousin to assert that the AD erred in finding a violation of the law where the criminal indictment concerning the same matter had been voluntarily dismissed by the government. Cousin himself sought the dismissal of the criminal indictment for health reasons. While the government ultimately acquiesced and dismissed the indictment, it did so only on the condition that language preserving the proceedings before the OTS be included in the dismissal. Not only was Cousin aware of this language and its intended purpose, but the language ultimately adopted was approved by his attorney. Cousin should be grateful for his miraculous recovery which he now asserts makes him sufficiently fit to run a banking institution, and thankful that he is not facing reinstated criminal charges. This Court will not, however, give credence to such a wrongheaded and inequitable argument.

Finally, the AD's determination that the misconduct prong may be met by violations of any law, banking-related or otherwise, is clearly supported by the statute. The plain language of the statute empowers the regulatory authority to prohibit a bank director from further participating in the conduct of the affairs of any regulated banking institution if that officer "has committed *any* violation of law...." 12 U.S.C. § 1464(d)(4)(A) (1982); *see Himes v. Shalala*, 999 F.2d 684, 688 (2d Cir.1993) (court must effectuate plain meaning of statute). Had Congress intended for only banking-related violations to trigger § 1464(d)(4), it could have limited the language of the misconduct prong accordingly. *See, e.g.*, 12 U.S.C. § 1829 (1989) ("any person·who has been convicted of any criminal offense *involving dishonesty or a breach of trust* may not participate ... in the conduct of the affairs of any insured depository institution") (emphasis added). The AD properly determined that Congress intended no such limitation.

Because the AD's determination that Cousin aided and abetted in the bribery of a federal official is fully supported by the record, the misconduct prong is met. We need not, therefore, address Cousin's objections to the AD's alternative findings concerning breach of fiduciary duty and unsafe or unsound business practices.

## B. *Effects*

Cousin also argues that the AD failed to support, with substantial evidence, his finding that Cousin's actions had harmful effects meeting the requirements of Part (2). Pointing to the fact that, since his indictment for bribery, County Federal has suffered no actual loss nor experienced an exodus of depositors, Cousin contends that the AD could not possibly find the requisite harmful effects of Cousin's alleged wrongdoing.

 Despite Cousin's contentions, however, the AD stated:

[I reject] the argument that the "effects" test requires more immediate or direct impact upon the association than establish-

ment of the possibility of serious prejudice to the interests of the institution's depositors. Congress simply did not draft section 1464 to impose such a requirement. The plain language of the statute makes clear that the AD's interpretation is proper. Section 1464(d)(4)(A) requires that the "interests of [the Bank's] savings account holders *could* be seriously prejudiced by reason of such violation...." (emphasis added). In light of this language, it would be irrational to require actual and immediate prejudice before a prohibition order may issue. *See In re Anonymous,* FDIC Docket No. FDIC–84–86g (regulation ineffective if regulator is unable to anticipate injury to depositors and act in advance of harmful impact); *Van Dyke v. Bd. of Governors of Fed. Reserve Sys.,* 876 F.2d 1377, 1380 (8th Cir.1989) ("we think it unrealistic ... to suggest the Board is powerless to respond to an officer's [wrongdoing] until actual harm to the Bank occurs"). The AD need only show sufficient evidence on the record to demonstrate the possibility of serious prejudice resulting from Cousin's illegal activities for the effects prong to be met.

■ In support of his finding of potential serious prejudice, the AD points to two factors: 1) Cousin's illegality could potentially injure depositor confidence in County Federal and lead to an exodus of depositors; and 2) Cousin's illicit conduct injured his credibility with the banking regulatory authority (namely the OTS), thus impairing his ability to effectively represent the Bank's interests. Both of these propositions were fully supported by the testimony of Michael Simone, an Assistant Director for the OTS in its Northeast Region. While we think that basing an effects determination on Cousin's credibility with the OTS alone would be insufficient, the AD's determination that there was a possibility of serious prejudice from the combination of the two factors cited above is appropriate and supported by substantial evidence.

## C. *Culpability*

■ Cousin also challenges the AD's determination that Part (3) was met by his alleged wrongdoing. Cousin points to the ALJ's conclusion that "the third prong of the

statute ... clearly intend[s] the Respondent's actions to relate to the financial institution directly, and not merely indirectly or in some peripheral manner." Contrary to the ALJ's interpretation of the statute, the AD determined that there need only be some knowing act of "personal dishonesty" to meet the requirements of the culpability prong. As the AD notes, while the second subcategory of Part (3) explicitly requires misconduct directed at the association, *see* 12 U.S.C. § 1464(d)(4)(A) (1982) ("willful or continuing disregard for the safety or soundness of the association"), no such requirement exists with respect to "such violation[s] ... involving personal dishonesty," *id.* Accordingly, the OTS need only demonstrate "a degree of culpability well beyond mere negligence." *Kim v. Office of Thrift Supervision,* 40 F.3d 1050, 1054 (9th Cir.1984). The evidence of Cousin's bribery and breaches of confidentiality clearly support such a finding of intentional wrongdoing.

### 3. *Entrapment and Outrageous Government Misconduct*

■ Finally, Cousin argues that the AD improperly excluded evidence concerning the allegedly outrageous government conduct to which Cousin had been subjected and incorrectly denied his entrapment defense as a matter of law. We note only that the evidence credited by the ALJ and AD clearly established that Cousin conceived of the bribery scheme of his own volition and presented it, unsolicited, to Agent McLaughlin. Under such circumstances, Cousin's entrapment defense—regardless of the outrageous government conduct Cousin asserts—necessarily fails as a matter of law. *See Jacobson v. United States,* 503 U.S. 540, 549, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992) ("the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents").

## CONCLUSION

The AD's prohibition order was fully supported by the evidence on the record and is proper as a matter of law. Accordingly, Cousin's petition for review of the final deci-

sion and order of the AD is denied. Because the OTS's Final Decision and Order stands, Cousin's appeal concerning the temporary suspension and prohibition is dismissed as moot.